**Dated: December 14, 2018**

**The following is ORDERED:**



_Sarah A Hall_
Sarah A Hall
United States Bankruptcy Judge

_____

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DAVID E. TERRELL, | ) | Case No. 10-16662-SAH |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| DAVID E. TERRELL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv.  No. 16-01109-SAH |
| | ) | |
| INTERNAL REVENUE SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 18 and 19, 2018, the Court conducted a trial on the Second Amended Complaint (the "Complaint") [Doc. 9] filed on January 3, 2017, by debtor David E. Terrell ("Terrell") against the United States of America *ex rel.* the Internal Revenue Service (the "IRS"), seeking a determination that his 1998 and 1999 tax debts were discharged in his 2010 bankruptcy case. Attorney Gary D. Hammond appeared on behalf of Terrell, and attorneys Gretchen E. Nygaard

and Richard G. Rose appeared on behalf of the IRS.  As directed by the Court at the conclusion

of trial, the parties filed their written closing arguments on July 31, 2018.

## JURISDICTION

The Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 1334(b), and

venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this matter is proper

pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C.

§ 157(b)(2)(I).

## BACKGROUND

Terrell filed a voluntary chapter 7 petition in 2010 and was granted a discharge in early

2011, and his bankruptcy case was closed shortly thereafter.  The IRS then attempted to collect

taxes relating to tax years prior to Terrell's 2010 bankruptcy.  In response, Terrell filed a motion

to reopen his case in 2015 and subsequently initiated this adversary proceeding seeking a

determination that his taxes for the 1998 and 1999 tax years had been discharged.  The IRS

contends that, pursuant to 11 U.S.C. § 523(a)(1)(C),[1] these taxes are not dischargeable because

Terrell made fraudulent returns and/or willfully attempted to evade or defeat the taxes.  The

actual amount of taxes Terrell owes the IRS is not at issue in this proceeding, but instead will be

determined in a case pending before the United States District Court for the Western District of

Oklahoma after this Court has determined whether or not the tax debts are dischargeable.

In making the following Findings of Fact and Conclusions of Law, the Court considered:

a.  The Final Pretrial Order [Doc. 102] (the "Pretrial Order"), entered on
    June 11, 2018;

---

[1]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy
Code, Title 11 of the United States Code.

2

b.    The trial record, including exhibits introduced by the IRS and Terrell and admitted by the Court,[2] and the testimony of the following witnesses:

(i)    Terrell;

(ii)    Linda Poindexter ("Poindexter"), Terrell's long-time business bookkeeper;

(iii)    Laurie Day ("Day"), Revenue Officer in the Oklahoma City office of the IRS;

(iv)    Randall K. Calvert ("Calvert"), Terrell's previous tax attorney; and

(v)    Pamela Jackson, formerly Pamela Terrell ("Jackson" or "Mrs. Terrell") (the IRS presented her designated deposition testimony taken on July 25, 2017, by reading into the record).

c.    United States' Post-Trial Submission filed on July 31, 2018 [Doc. 121] ("IRS Closing Argument"); and

d.    David Terrell's Closing Arguments filed on July 31, 2018 [Doc. 122] ("Terrell Closing Argument").

## FINDINGS OF FACT[3]

### *Terrell's Relevant Business Background*

1.    After graduating from college and working in his father's windows and siding

business in Indiana, in the 1970s Terrell opened his own patio and sunroom company in

---

[2]Terrell only admitted one exhibit into evidence, Plaintiff's Exhibit 2, which was identical to IRS Exhibit 17.  Therefore, all citations to exhibits are to the IRS's exhibits and identified simply as "Exhibit."

[3]The Court would point out in advance that the following may seem a somewhat strange and random assemblage of facts and a less than complete and cohesive chronicle of the now 20-year-long history of the dealings between the parties.  But this inevitably results from the passage of considerable time and the inability of Terrell to produce relevant documents.  See ¶¶ 95-96 below for more information.  In other words, as the party with the burden of proof, the IRS had quite the uphill battle.

Cincinnati, Ohio.  At some point, Terrell relocated his business to Terre Haute, Indiana and thereafter moved his business to Oklahoma in the early 1980s.  Over the past 40 plus years, Terrell has continued to operate a business that includes one or more of the following:  roofing, siding, windows, remodeling, and home interior services.[4]  Terrell testimony, Transcript of Proceedings Held on June 18, 2018 (the first day of trial, hereafter "Tr. 1"), pp. 15-17.

2.      At all times, Terrell has been the owner and president of the home improvement business he has operated.  Terrell testimony, Tr. 1, pp. 15-17; Poindexter testimony, Tr. 1, p. 118; Jackson testimony, Tr. 1, p. 194.

3.      Terrell's home improvement business in Terre Haute, Indiana, "had a lot of different names through the years."  Jackson testimony, Tr. 1, p. 194.

4.      Since being established in Oklahoma, Terrell's business has been located in three different places in the Oklahoma City/Edmond area:  8005 S. I-35, Oklahoma City; 8825 S. Santa Fe, Oklahoma City; and at his home in Edmond, Oklahoma.  Terrell testimony, Tr. 1.

5.      Since being operated in Oklahoma, Terrell's home improvement business has been in continuous existence and, although consisting of substantially similar activities, has been incorporated under Oklahoma law and operated under the following different names:  Terrell's, Terrell Inc., Terrell Roofing, Terrell Siding, Terrell Home Center, Inc., T-Square, L.L.C., and

---

[4]Because the various services offered varied over time, the Court will refer to Terrell's business generally as a home improvement business.

4

David Terrell, Inc.[5]  Terrell testimony, Tr. 1; Poindexter testimony, Tr. 1, pp. 120-21; Exhibits 70-74.  The Court notes that this list of corporations may not be exhaustive.[6]

6.      Terrell admitted it was "possible" that he changed the names of his home improvement business in order to avoid creditors.  Terrell testimony, Tr. 1, p. 20.

7.      During the tax years in question, Terrell's business changed banks to avoid garnishment by creditors.  Poindexter testimony, Tr. 1, p. 129.

8.      At all times, Terrell was in complete control of the finances of his business and could determine the salary paid to him from the business, if any.  Terrell testimony, Tr. 1; Poindexter testimony, Tr. 1, p. 128.

9.      In addition to his home improvement business, during the tax years in question, Terrell owned InfoTel Solutions, Inc., a software company that sold predictive dialers and

---

[5]Terrell's, Inc. was incorporated January 7, 1992, and dissolved December 8, 1999 (Exhibit 74); Terrell Siding, Inc. was incorporated March 31, 1988, and dissolved December 8, 1999 (Exhibit 71); Terrell Home Center, Inc. was incorporated June 1, 1998 (Exhibit 72); T-Square, L.L.C. was incorporated March 31, 2000 (Exhibit 73); David Terrell, Inc. was incorporated June 9, 2005 (Exhibit 70).

[6]In response to the directive "Please identify all business of which you were an owner, partner, director, co-owner, manager, or held a position of similar authority during the relevant period."  Terrell stated:

> Plaintiff does not recall all of the businesses of which he was an owner, partner, director, co-owner, manager, or held a position of similar authority during the 1998 and 1999 period.  To the best of his recollection, Plaintiff states that he recalls having an interest in or otherwise being involved in Terrell Roofing Corporation, Terrell's Siding, Inc., Terrell's Home Center, T-Squared, Terrell's, Inc., Terrell's Roofing and Siding and Info-Tel Solutions.

Exhibit 29 at p. 3, Interrogatories ¶ 4.  Additionally, see ¶ 25 below.

operated on the premises of his home improvement business.  Terrell testimony, Tr. 1, p. 20;

Poindexter testimony, Tr. 1, p. 120; Exhibit 42.

### Terrell's Relevant Personal/Financial Background Prior to and During Tax Years in Issue

10.     The Terrells filed for bankruptcy protection in early 1986.  After the chapter 7

trustee issued his final report of no assets for distribution, the Terrells were granted a discharge

on November 24, 1986, in Case No. 86-00832.[7]

11.     In August of 1990, Terrell was invited to and accepted membership for his family

in Oak Tree Country Club in Edmond, Oklahoma.  Exhibit 68.

12.     At some point in 1997, Terrell bought a house on Fox Lake Lane in Edmond,

Oklahoma.  Terrell testimony, Tr. 1.  Although the purchase price of the new home was not

introduced into evidence during trial, the evidentiary record indicates that Terrell placed the

following values on his home for purposes of interactions with the IRS and bankruptcy filings:

(i) $297,500 in November 1999, Exhibit 40; (ii) $235,000 in April 2001, Exhibit 8;

(iii) $275,000 in December 2008, Exhibit 51; and (iv) $320,580 in November 2010, Exhibit 23.

13.     At the time Terrell purchased his home on Fox Lake Lane in 1997, he owned

another home located on Barrington Lane, also in Edmond.  Mrs. Terrell had been living in the

previous home during a period of marital separation.  When the Terrells resumed their marriage

and both moved into the home on Fox Lake Lane, the home on Barrington Lane was rented out

---

[7]A bankruptcy court may take judicial notice of the docket entries and orders entered in prior bankruptcy cases filed by the same debtor for the purpose of establishing the existence of those materials but not the truth of the facts asserted in them.  In re Minor, 531 B.R. 564, 573 (Bankr. E.D. Pa. 2015), aff'd, 579 B.R. 333 (E. D. Pa. 2016).  See also Sherman v. Rose (In re Sherman), 18 F. App'x 718, 721 (10th Cir. 2001)(unpublished)(court may take notice of filings in prior bankruptcy cases).

to Ted and Linda Tate (collectively, the "Tates").  Terrell testimony. Tr. 1, pp. 28-29 ; Jackson testimony, Tr. 1, p. 200.

14.     During the tax years in question, Terrell's teenage daughter drove a 1994 Toyota Camry, his teenage son drove a 1996 Dodge truck, and his wife drove a 1996 Ford Explorer.  The combined total of the monthly payments for the three vehicles was $1,527.  Exhibit 33; Terrell testimony, Tr. 1, pp. 34-35.

15.     At some point in 1998, Terrell purchased a pair of jet skis for his family's use. Terrell testimony, Tr. 1, p. 56; Jackson testimony, Tr. 1, pp. 205-06.

16.     In October 1999, Terrell had a custom deck built onto his house that cost at least $1,254.  Exhibit 81; Terrell testimony, Tr. 1, pp. 50-51.

17.     In December 1999, Terrell purchased an elliptical machine for his personal home use that cost $1,410.34.  Exhibit 82; Terrell testimony, Tr. 1, pp. 53-54.

### The Terrells' 1997, 1998, and 1999 Tax Returns

18.     Terrell incorporated Terrell Home Center, Inc. on June 1, 1998.  Exhibit 72.

19.     On October 15, 1998, the Terrells filed a joint federal personal income tax return for tax year 1997 and signed it under the penalty of perjury.  Exhibit 16 at p. 19.

20.     For tax year 1997, the Terrells reported adjusted gross income of $10,000.  The income consisted solely of W-2 wages for Terrell from Terrell, Inc.  The Terrells' reported taxable income was zero, and therefore, their tax liability was zero.  In fact, they claimed an Earned Income Tax Credit due them by way of refund.  Exhibit 41 at p. 8810-16; Terrell testimony, Tr. 1, p. 72.

21.     On April 15, 1999, the Terrells filed a joint federal personal income tax return for tax year 1998 and signed it under the penalty of perjury.  Pretrial Order ¶ 3.

22.     For tax year 1998, the Terrells reported adjusted gross income of  $26,156.  The income consisted of:

a.      W-2 wages for Terrell from Terrell Home Center, Inc.;

b.      "Sales Consultation Income" for Terrell reported on Schedule C-EZ

(business name was stated as David Terrell – Sales, and the business address as

1128 Fox Lake Lane, Edmond, OK); and

c.      Business Income for Mrs. Terrell reported on Schedule C-EZ.

The Terrells' reported taxable income was $3,957, and, after claiming an Education Tax Credit and a small Earned Income Tax Credit, their income tax liability was $121.[8]  Exhibit 1.

23.     On April 17, 2000, the Terrells filed a joint federal personal income tax return for tax year 1999 and signed it under the penalty of perjury.  Pretrial Order ¶ 4.

24.     For tax year 1999, the Terrells reported adjusted gross income of $45,066.  The income consisted of:

a.      W-2 wages for Terrell from Terrell Home Center, Inc.;

b.      1099-MISC income for Mrs. Terrell from James M. Taylor Designs;

c.      Business Income for Mrs. Terrell reported on Schedule C; and

d.      Business Loss for Terrell Home Center reported on Schedule K.

The Terrells' reported taxable income was $6,940, and their income tax liability was $709. Exhibit 2.

_____

[8]Calculation of income tax does not include self-employment taxes.

***Terrell's Initial Interactions with the IRS re: Trust Fund Employment Taxes***

25.     At some point in 1999, the IRS issued a Proposed Assessment of Trust Fund

Recovery Penalty in the amount of $117,518.53 for nonpayment of employment taxes by "Terrell

Roofing Corporation" ("Trust Fund Recovery Penalty").  Absent evidence in the record of the

incorporation of Terrell Roofing Corporation, it was necessary for the Court to search the

Oklahoma Secretary of State business records for clarification.  Based on that search, it appears

Terrell Roofing Corporation may have been a DBA for Terrell's, Inc. and/or was merged into

Terrell's, Inc.[9]  Nonremittance of the trust fund taxes included the third and fourth quarters of

1997 and first and second quarters of 1998.  Terrell consented to assessment and collection of the

penalty on August 13, 1999.  Exhibit 40 at p. 8765.

26.     Also on August 13, 1999, Terrell executed a Form 2848 Power of Attorney and

Declaration of Representative (the "POA"), authorizing Randall Tollison of Compromise

Consultants and Paul McCurtain of C. Michael Clark & Associates to represent him before the

IRS with respect to the Trust Fund Recovery Penalty.  Curiously, representation under the POA

also pertains to Terrell's personal income taxes for years 1997, 1998, and 1999.  Exhibit 40 at

p. 8763.

27.     In November 1999, Randall Tollison, on behalf of Terrell, submitted an Offer in

Compromise ("OIC") with respect to the Trust Fund Recovery Penalty against Terrell Roofing

Corporation.  The November 1999 OIC (the "1999 OIC"), based on doubt as to collectibility due

---

[9]See Filing Number 1900507654, available at:  https://www.sos.ok.gov/corp/corpInquiry
Find.aspx?Name=Terrell Roofing.  This site also reveals another entity incorporated by Terrell
that was perhaps an earlier iteration of his home improvement business:  Terrell Industries Inc.,
Filing No. 1900432186, incorporated in May 1985, also apparently known as or associated with
Terrell's Sleep World.

to insufficient assets and income to pay the full amount, offered to pay the IRS only $500 of the $117,518.53 penalty. Exhibit 40 at p. 8757.

28.    Although the 1999 OIC related to taxes owed by Terrell Roofing Corporation, the 1999 OIC contained no Collection Information Statement regarding Terrell Roofing Corporation, Terrell's, Inc., or any other business owned by Terrell. The Collection Information Statement for Individuals submitted with the 1999 OIC stated Terrell was employed as the sales manager for Terrell Home Center, Inc., and Mrs. Terrell was self-employed and doing business as Terrell Interiors. Their combined monthly income was stated as $3,664. The only bank account listed was an account at MidFirst Bank allegedly in Mrs. Terrell's name with a balance of $226. Further, the 1999 OIC computes the Terrells' net disposable income as a negative $163 per month and net realizable equity in their assets as $226. Exhibit 40 at pp. 8772, 8875, 8780.

29.    When he signed the 1999 OIC on November 10, 1999, claiming only one bank account in Mrs. Terrell's name with a balance of $226, another undisclosed bank account in Mrs. Terrell's name at MidFirst Bank had a balance of $5,363.66. Exhibit 80 at p. 3620.

30.    On December 8, 1999, Terrell dissolved two of his corporations: Terrell's, Inc. and Terrell Siding, Inc. Exhibits 71 & 74.

31.    In the last two weeks of March 2000, Terrell withdrew funds from and caused cashiers checks, or checks made out to himself, to be issued from the Terrell Home Center Inc. bank account at MidFirst Bank that totaled over $30,000. Exhibit 109.

32.    On March 31, 2000, Terrell formed a new corporation named T-Square, L.L.C. Exhibit 73.

33.    In July 2000, Terrell completed a "Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Tax" with respect to Infotel Solutions, Inc.  The Report asked the question "Have you ever been involved with another company which had tax problems?" Terrell responded "N/A," notwithstanding the recent Trust Fund Recovery Penalty issues with Terrell Roofing Corporation.  Exhibit 42 at p. 8845.

34.    In September 2000, Terrell submitted another OIC, this time apparently without professional assistance, with respect to the Trust Fund Recovery Penalty for nonpayment of taxes by Terrell Roofing Corporation and Infotel Solutions, Inc. (the "2000 OIC").  Again, the 2000 OIC offered to pay the IRS only $500 on the basis of doubt as to collectibility due to insufficient assets and income to pay.  Exhibit 43 at p. 8828.

35.    Notwithstanding his representations to the IRS that he could only afford to pay $500 on his tax liability, on November 11, 2000, Terrell purchased a new Acura paying $5,000 cash toward the purchase price.  On February 10, 2001, Terrell purchased yet another new Acura, again paying $5,000 cash toward the purchase price.  Terrell testimony, Tr. 1, pp. 74-75.

36.    Upon inquiry from the IRS, in March 2001, Terrell submitted a letter together with additional documents in support of the 2000 OIC.  The letter states "I personally do not have a checking account, nor am I an authorized signer on any checking account."  Exhibit 47 at p. 8839.  Also included in the documents is an affidavit by Terrell that states "I never personally owned the assets of Terrell Home Center, Inc."  Exhibit 47 at p. 8441.  Further, the documents include a declaration made under penalty of perjury by Terrell that states "[d]uring the past twelve month period, I have not maintained a checking or savings account in my name or any

11

other name.  As of the date shown below, the total cash on hand in my possession or control is $-0-."  Exhibit 47 at p. 8842.

37.    In March 2001, Terrell also submitted a Form 433-B Collection Information Statement for Businesses with respect to Terrell Home Center, Inc. that stated Mrs. Terrell was president of the corporation, and that it had no bank accounts, no assets, and approximately $610,000 in liabilities. Exhibit 48.

38.    At trial, the IRS demonstrated that none of these statements were true.  First, Terrell admitted he was the owner and president of Terrell Home Center, Inc., and, during the twelve-month period prior to making the statements, he had authority to issue checks from the account Terrell Home Center, Inc. maintained at MidFirst Bank.  Terrell testimony, Tr. 1, pp. 88-91.  Second, Terrell admitted he has always had a bank account since 1997.  Terrell testimony, Transcript of Proceedings Held on June 19, 2018 (second day of trial, hereafter "Tr. 2"), p. 43.  Third, during the relevant time period, checks made out to Terrell were deposited into Mrs. Terrell's account at MidFirst Bank.  Exhibits 109-110.

39.    Terrell's March 2001 submission to the IRS in support of the 2000 OIC did not contain a  Form 443-B with respect to T-Square, L.L.C., which Terrell incorporated in March 2000 to conduct the same home improvement business previously operated as Terrell Home Center, Inc.  Exhibit 73; Terrell testimony, Tr. 1, pp. 80-82.

### The Terrells 2001 Chapter 7 Bankruptcy Filing

40.    IRS agents contacted and interviewed Poindexter, Terrell's bookkeeper, with respect to Terrell's personal income tax issues sometime in 2000 or 2001.  Poindexter testimony Tr. 1, p. 129.

41.    The Terrells filed a joint voluntary chapter 7 petition on April 26, 2001, in this Court, Case No. 01-14289.  Pretrial Order ¶ 5.

42.    The Terrells' 2001 Schedule B does not list ownership of any business interests. Schedule I states that Terrell has been employed by "Terrell's" as a salesman for a period of one month and has monthly gross wages of $1,000.  Exhibit 8.  However, the corporation named Terrell's, Inc. was dissolved on December 8, 1999, and Terrell's business was, therefore, likely being operated under T-Square, L.L.C., which was incorporated on March 31, 2000.  Exhibits 73 & 74.

43.    The Terrells' 2001 Schedule B lists $100 cash on hand, no checking, savings, or other bank accounts, and no vehicles.  Exhibit 8.

44.    The Terrells' 2001 Schedule E lists a debt to the IRS in the amount of $50,000. Exhibit 8.  No information is given regarding the tax year or tax type of the scheduled IRS debt.

45.    During the pendency of the 2001 bankruptcy case, Terrell submitted a POA dated August 23, 2001, authorizing Randall Tollison and Norma Woodard to represent him before the IRS with respect to both personal and corporate income taxes for years 1996, 1997, 1998, 1999, and 2000.  Exhibit 49.

46.    Also during the pendency of the bankruptcy case, on January 28, 2002, Terrell purchased a 2002 Acura MDX, paying $41,000 in the form of a cashier's check issued by BankOne, payable to Bob Howard Acura and endorsed by Terrell.  Terrell testimony, Tr. 1, pp. 98-99; Exhibit 61.

13

47.     After the chapter 7 trustee filed a report of no distribution to creditors [Doc. 35], the Terrells received a discharge on November 12, 2002 [Doc. 37], and the case was closed on January 13, 2003 [Doc. 39].  Exhibit 7.

### *Terrell's Criminal Personal Income Tax Case*

48.     Terrell admitted that he learned of the IRS's criminal investigation into his personal income taxes sometime before 2003.  Terrell testimony, Tr. 1, p. 103.

49.     On October 1, 2004, a federal criminal information was filed against Terrell for filing a fraudulent income tax return for tax year 1997 in the United States District Court for the Western District of Oklahoma ("District Court").  Pretrial Order ¶ 6.

50.     Terrell was initially represented in the tax matter by criminal attorney Merle Gile and entered a plea of guilty.  Exhibit 9.  However, because he thought his sentence was to include a term of imprisonment, Terrell then stated he was not guilty.  Therefore, the District Court did not accept the guilty plea.  Terrell testimony, Tr. 1; Calvert testimony, Tr. 2, pp. 51-52.

51.     Terrell then retained Calvert, a tax attorney and certified public accountant, to represent him in the criminal tax matter.  Terrell testimony, Tr. 1; Calvert testimony, Tr. 2, p. 52.

52.     During the IRS's criminal investigation of Terrell, the IRS agents had to "create two separate sets of books out of one set of books."  Calvert testimony, Tr. 2, p. 52.  It is not clear what books were required to be separated, but it may have been separation of Terrell's home improvement business books from those of InfoTel Solutions, Inc., and/or separation of the books of the three different corporations Terrell conducted business through during the relevant tax years:  Terrell's, Inc., Terrell Siding Inc., and Terrell Home Center, Inc.  See Exhibit 50.  Terrell's business books also needed to be separated from his personal books.

14

53.    On March 4, 2005, Terrell signed a Petition to Enter Plea of Guilty with respect to the charge of filing a fraudulent income tax return for tax year 1997.   Pretrial Order ¶ 7.

54.    On the Petition, Terrell stated his employer as Terrell's, Inc., but Terrell's, Inc. was dissolved in 1999.  Exhibits 14 & 74.

55.    As part of the Petition, Terrell specifically acknowledged he owed taxes for tax years 1997, 1998, and 1999.  Pretrial Order ¶ 7.

56.    A Plea Agreement was filed on March 9, 2005, in which Terrell pled guilty to violating 26 U.S.C. § 7206(1) by filing a fraudulent income tax return for tax year 1997. Terrell's guilty plea is an admission that: "1) he made and subscribed a tax return; 2) the return contained a written declaration that the return was made under the penalties of perjury; 3) he did not believe the return was true and correct as to every material matter; and 4) he acted willfully in filing the return."  Exhibit 15 at p. 2.  The Plea Agreement contains several important provisions:

    a        First, it specifies that for purposes of sentencing "the parties agree that the total tax loss (for the tax years 1997-99) is greater than $13,500.00 but less than $23,500.00."  Exhibit 15 at p. 4.  However, the Plea Agreement also clearly states that it "binds only the United States Attorney's Office of the Western District of Oklahoma and does not bind any other federal, state or local prosecuting, administrative or regulatory authority."  Exhibit 15 at p. 1.

    b.       Second, it provides that "[i]f defendant enters a plea of guilty as described above and fully meets all obligations under this agreement, he will not be further prosecuted by the United States for any crimes related to his

15

participation in making and subscribing false tax returns during the period from 1998 through 2000." Exhibit 15 at p. 10.

      c.     Third, it requires Terrell "to bring his tax obligations current and amend any necessary tax returns." Exhibit 15 at p. 8; Pretrial Order ¶ 8.

57.     At the plea proceedings, Terrell admitted to the District Court that he deliberately filed his 1997 tax return stating his income as $10,000 when he in fact knew that his income was approximately $130,000. Exhibit 16 at p. 19.

58.     On July 5, 2005, the District Court entered a criminal judgment against Terrell for filing a fraudulent 1997 tax return. Pretrial Order ¶ 9.

59.     The maximum penalty that could have been imposed on Terrell for his crime was "three (3) years imprisonment or a fine of $100,000.00 (or possible alternative fine of $250,000.00 pursuant to 18 U.S.C. § 3571), or both such fine and imprisonment, as well as a mandatory special assessment of $100.00, and a term of supervised release of one (1) year." Exhibit 15 at p. 2.

60.     At sentencing, the District Court imposed a fine of only $5,000 and did not incarcerate Terrell. Additionally, the criminal judgment ordered Terrell to pay restitution in the amount of $16,422. One of the probation terms of the criminal judgment was that Terrell "comply with the Internal Revenue Service in the compilation and payment of all federal tax due and owing." Exhibit 20 at p. 4; Pretrial Order ¶ 9.

61.     According to Calvert, Terrell believed that the restitution ordered in the criminal matter was the amount of the his income taxes due for 1997 and that, when he paid it, he would have paid his 1997 income taxes in full. Calvert testimony, Tr. 2, p. 68.

62.     Calvert advised Terrell that there would be a subsequent civil assessment of liabilities against him for tax years 1997, 1998, and 1999.  Calvert testimony, Tr. 2, p. 72.

63.     Calvert did not represent Terrell with respect to civil tax matters after the criminal matter was resolved.  Calvert testimony, Tr. 2, pp. 60-61.

### *IRS Interactions Following Terrell's Criminal Judgment and Sentencing*

64.     On October 27, 2005, Terrell and Jackson, the former Mrs. Terrell,[10] signed IRS Form 4549 (Income Tax Examination Changes) (the "Form 4549") consenting to assessment and collection of taxes for tax years 1997, 1998, and 1999.  Exhibit 50.

65.     The Form 4549 Terrell signed states that the deficiency (additional tax due) for tax year 1998 is $98,738.  The deficiency for tax year 1999 is stated as $51,422.  After the addition of the civil fraud penalty and interest, the amount due for tax year 1998 is stated as $264,712.46, and the amount due for tax year 1999 is stated as $127,190.57.  Above Terrell's signature, the Form 4549 states:  "I do not wish to exercise my appeal rights with the Internal Revenue Service or to contest in the United States Tax Court the findings of this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties . . . plus additional interest as provided by law." Exhibit 50.

66.     The IRS assessed the additional tax due and interest for tax years 1997, 1998, and 1999 on January 2, 2006.   Exhibits 4 & 5.

67.     On February 6, 2006, the IRS issued notices of intent to levy with respect to taxes for tax years 1998 and 1999.  Exhibit 4 at p. 7 & Exhibit 5 at p. 8.

_____

[10]The Terrells were divorced in September 2003.  Terrell testimony, Tr. 1, p. 103.

68.     Terrell submitted an OIC on May 3, 2007 (the "2007 OIC"), which the IRS rejected several months later.  Exhibits 4 & 5 at p. 4; Day testimony, Tr. 1, p. 185.

69.     On October 31, 2008, Terrell satisfied payment of his criminal restitution of $16,422.  Exhibit 9.

70.     On December 12, 2008, only two months after payment in full of his criminal restitution, Terrell submitted another OIC to the IRS, this time with the assistance of Roderick H. Polston (the "2008 OIC").  The 2008 OIC purported to relate to the Trust Fund Recovery Penalty for nonpayment of taxes by Terrell Roofing Corporation, the Trust Fund Recovery Penalty for nonpayment of employment taxes by Infotel Solutions, Inc., and personal and/or corporate income taxes for the thirteen tax years 1996 through 2008.  The 2008 OIC states that the total debt owed exceeds $1,500,000, but Terrell offered to pay the IRS only $15,831.19 in $500 monthly payments over a two-year period, with a final payment of $3,831.19.  The 2008 OIC is premised, once again, on the basis of doubt as to collectibility due to insufficient assets and income to pay.  Exhibit 51.

71.     With the 2008 OIC, Terrell submitted a Form 433-A Collection Information Statement for Individuals stating his occupation as self-employed contractor and listing his monthly income as $2,481, composed of $1,000 in wages and $1,481.26 in net business income.  Yet, no employer paying wages is identified, and Sections 5 and 6 of the form pertaining to self-employed taxpayers, which Terrell claimed to be, was left blank.  Exhibit 51 at pp. 9225-26.  The 2008 OIC further indicates Terrell has no cash on hand, no personal bank accounts of any kind, and no assets other than his residence and its furniture contents.

72.    Terrell's 2008 OIC neither disclosed ownership of, nor gave any information about, his home improvement business.  But it appears that in 2008, Terrell was conducting business under David Terrell, Inc., which he incorporated in June 2005.  Exhibit 70.  At trial, the IRS established that, during 2008, David Terrell, Inc. maintained a bank account at Bank of Oklahoma and one at Chase Bank.  Exhibit 38.  Additionally, Terrell admitted he has always had a bank account since 1997.  Terrell testimony, Tr. 2, p. 43.

73.    Terrell withdrew the 2008 OIC on June 11, 2009.  Exhibits 4 & 5.

74.    The IRS issued a statutory notice of intent to levy on the 1997, 1998, and 1999 taxes on June 29, 2009.  Exhibits 4 & 5 at p. 8.

### Terrell's 2010 Chapter 7 Bankruptcy Filing

75.    Terrell filed a voluntary chapter 7 petition on November 1, 2010, in this Court, Case No. 10-16662.   Pretrial Order ¶10.

76.    Terrell's 2010 Schedule B listed ownership of 1,000 shares of "Terrills Siding" valued at zero.  His Schedule I states his occupation as owner of "Terrill's Siding" (employed 9 years) with gross monthly wages of $2,766.67.  Exhibit 23 at p. 16.  However, Terrell's Siding, Inc. was dissolved as a corporation in 1999.  Exhibit 71 at p. 8920.  The document filed as Employee Income Records/Pay Advices [Bankruptcy Doc. 13] was issued by David Terrell, Inc., which was incorporated in June 2005.  It states the employee wages total for the period March 1, 2010, to December 31, 2010, as $5,018.78.  However, the total amount was received between July 27, 2010, and September 30, 2010.

77.    Under Question 18 of his 2010 Statement of Financial Affairs regarding nature, location and name of business, Terrell listed only "Terrill's Siding".  Exhibit 23 at p. 25.

19

78.    Terrell's 2010 Schedule B listed no cash on hand and $55 in a checking account. Exhibit 23 at p. 4.

79.    Terrell's 2010 Schedule E listed the IRS as an unsecured priority creditor in the amount of $95,000.  Pretrial Order ¶ 11.  No information is given regarding the tax year or tax type of the scheduled IRS debt.

80.    The day before he filed his bankruptcy schedules on November 17, 2010, Terrell traveled for non-business purposes to Austin, Texas, with various expenses paid by check drawn on the David Terrell, Inc. account at Bank of Oklahoma.  In December 2010, the same account paid expenses incurred at the luxury resort and spa Devil's Thumb Ranch in Tabernash, Colorado.  Exhibit 123; Terrell testimony, Tr. 1 at pp. 145-48.

81.    On January 31, 2011, the chapter 7 trustee filed a report of no distribution to creditors [Dkt. sheet].  Thereafter, Terrell received his discharge on February 16, 2011, and the bankruptcy case was closed on April 5, 2011.   Pretrial Order ¶ 12.

### *Post 2010 Bankruptcy Events*

82.    Shortly after Terrell's bankruptcy case was closed, the IRS again issued a statutory notice of intent to levy on 1998 and 1999 taxes on August 8, 2011.  Exhibits 4 & 5 at p. 8.

83.    Terrell then filed another OIC on October 25, 2011, this time assisted by Jay Flinton, CPA, Inc., paying the $150 OIC submission fee and an additional $400 (the "2011 OIC").  The 2011 OIC  purports to relate to personal income taxes for 1997, 1998, 1999, 2008, and 2009, as well as to a "1998 Civil Penalty," and offers to pay a total of $2,000.  Exhibit 54; Day testimony, Tr. 1 at pp. 190-91.

20

84.     During the pendency of his 2011 OIC, on February 13, 2012, Terrell wrote himself a check from a "Terrell's" bank account at Bank of Oklahoma for $7,000.  Exhibit 86; Terrell testimony, Tr. 1 at p. 161.

85.     Terrell withdrew his 2011 OIC on May 10, 2012.  Exhibits 4 at p. 5 & Exhibit 5 at p. 6.

86.     Other than the $550 submitted with the 2011 OIC, which was credited to his 1999 tax liabilities, Terrell has made no payments toward the 1998 or 1999 taxes he owes.  Day testimony, Tr. 1 at pp. 186, 190-91; Exhibits 4 & 5.

87.     After Terrell withdrew his 2011 OIC, the IRS again issued statutory notices of intent to levy on the 1998 taxes on June 4, 2012, and the 1999 taxes on July 9, 2012.  Exhibits 4 & 5 at p. 8.

88.     In December 2012, Terrell moved to reopen his bankruptcy case for purposes of determining the dischargeability of his taxes, and the Court entered an order granting the motion on January 4, 2013.  However, Terrell took no further action, and the bankruptcy case was subsequently closed on February 25, 2014.  Pretrial Order ¶ 13.

89.     The IRS issued yet another statutory notice of intent to levy on the 1998 and 1999 taxes on January 12, 2015.  Exhibits 4 & 5 at p. 8.

90.     In June 2015, Terrell again moved to reopen his bankruptcy case for the purpose of determining the dischargeability of his income taxes, and the Court again entered an order granting the motion on July 14, 2015.  Pretrial Order ¶ 14.

*Adversary Proceeding No. 15-01272 regarding Dischargeability of the 1997 Taxes*

91.    Notwithstanding that he pled guilty to and was convicted of filing a fraudulent return for tax year 1997, on November 3, 2015, Terrell filed Adversary Proceeding No. 15-01272 seeking a determination that his 1997 taxes had been discharged in his 2010 bankruptcy case. Pretrial Order ¶ 15.

92.    On March 21, 2016, the Court granted summary judgment in favor of the IRS in Adversary Proceeding No. 15-01272 on the ground that Terrell's prior fraud conviction for tax year 1997 collaterally estopped him from challenging the nondischargeability of the associated tax debt.  Pretrial Order ¶ 16.

93.    Terrell appealed this Court's summary judgment in Adversary Proceeding No.15-01272 to the United States Bankruptcy Appellate Panel for the Tenth Circuit, which affirmed this Court's decision on February 17, 2017.  Pretrial Order ¶ 17.

*Adversary Proceeding No. 16-01109 regarding Dischargeability of the 1998 and 1999 Taxes*

94.    While Adversary Proceeding No. 15-01272 relating to his 1997 taxes was pending on appeal, Terrell commenced this adversary proceeding on October 31, 2016, seeking a determination that his 1998 and 1999 tax obligations were discharged in his 2010 bankruptcy case.  Pretrial Order ¶ 18.

95.    After the Scheduling Conference [Doc. 17] was held and the Scheduling Order enetered [Doc. 18], the IRS served Terrell with its Interrogatories, Requests for Admissions, and Requests for Production of Documents on March 24, 2017.  On April 18, 2017, Terrell provided a combined response to the IRS's discovery requests and produced no documents.  The IRS followed-up Terrell's responses with a letter highlighting the deficiencies in his discovery

22

responses.  Terrell unsatisfactorily supplemented his answers to the discovery requests, and the IRS was then forced to file a motion to compel [Doc. 20].  The Court entered an order compelling Terrell to answer interrogatories and produce documents [Doc. 45] on July 19, 2017.

96.     Terrell eventually produced some of the more recent documents that were requested by the IRS.  However, Terrell ultimately failed to produce any documents reflecting his actual income received or reported in 1998 and 1999, failed to produce any documents relating to the businesses he operated during that period, and failed to produce any documentation of his business or personal expenses from 1998 to 2007.  See United States' Motion to Shift the Burden of Proof and Notice of Opportunity for Hearing [Doc. 51]; Terrell Production Stipulation [Doc. 53]; David E. Terrell's Response with Brief in Support to United States' Motion to Shift the burden of Proof and Notice of Opportunity for Hearing [Doc. 54].

97.     On October 30, 2017, the IRS filed a motion for summary judgment [Doc. 64] arguing it was entitled to judgment as a matter of law because Terrell willfully attempted to evade or defeat the taxes.  The summary judgment motion did not argue that Terrell had filed fraudulent returns.  The Court denied the IRS's summary judgment motion by order entered on February 6, 2018 [Doc. 90] because the issue of Terrell's intent to willfully evade or defeat taxes was a disputed material fact.

***Additional Evidence Specifically Relating to Filing Fraudulent Returns For 1998 and 1999***

98.     Terrell admitted he knew he had a duty to file accurate federal income tax returns. Terrell testimony, Tr. 1, p. 21.

99.     Terrell admitted he knew he had a duty to report his business income in some form on his personal income tax return.  Terrell testimony, Tr. 1, p. 20-21.

23

100.    Terrell's business paid personal expenses on his behalf.  He testified it was his practice to account for these expenses by having them booked to his "draw account," with those amounts being reported as income to him by issuance of a Form 1099.  Terrell testimony, Tr. 1, p. 22.

101.    Poindexter testified that Terrell would tell her whether an expense should be noted as his personal expense in the general ledger account of the business' bookkeeping software program, and that, at the end of the year, Terrell and his accountant would get together to review the personal expenses.  Poindexter testimony, Tr. 1, p. 127.

102.    Terrell admitted he provided his tax preparer with the financial information necessary to complete his tax returns and reviewed the returns before he signed them.  Terrell testimony, Tr. 1, p. 22.

103.    For tax year 1998, Terrell reported no partnership/S corporation income from Terrell's, Inc., Terrell's Siding, or Terrell's Home Center, Inc.  Exhibit 39.  Additionally, no 1099's were issued to Terrell by his business on account of the personal expenses paid or, if issued, were not reported.  At trial, the IRS demonstrated the Terrells had **at least** $42,738.54 in income during 1998 that was not reflected in their 1998 return.[11]  That unreported income is made up of the following items:

| | | |
|---|---|---|
| Rental income | $4,500 | Exhibit 102 |
| Business checks deposited in personal account | $21,873 | Exhibit 96 |

_____

[11]The Court modifies the dollar figure of income with "at least" because as noted in ¶¶ 95-96 above, the IRS had no actual books and records of Terrell's home improvement business during the relevant tax years.

| | | |
|---|---|---|
| Country club fees<br>paid by business[12] | $6,461 | Exhibit 99 |
| Family car payments<br>paid by business | $9,904.54 | Exhibit 97 |

104.    For tax year 1999, Terrell reported no partnership/S corporation income from Terrell's, Inc. or Terrell's Siding, Inc.  For Terrell's Home Center, Inc., Terrell reported a $1,139 loss.  Exhibit 39.   No 1099's were issued to Terrell by his business on account of the personal expenses paid or, if issued, were not reported.  At trial, the IRS demonstrated the Terrells had **at least** $65,923.24 in income during 1999 that was not reflected on their return.  That unreported income is made up of the following items:

| | | |
|---|---|---|
| MISC-1099<br>James M. Taylor Designs | $13,984 | Exhibit 43 |
| MISC-1099<br>Terrell Home Center<br>(Pam Terrell) | $27,500 | Exhibit 43 |
| Business checks deposited<br>in personal account | $9,612.10 | Exhibit 105 |
| Country club fees<br>paid by business | $4,493.91 | Exhibit 106 |
| Family car payments<br>paid by business | $7,668.89 | Exhibit 103 |
| Deck on house<br>paid by business | $1,254.00 | Exhibit 81 |
| Elliptical purchased<br>by business | $1,410.34 | Exhibit 82 |

---

[12]Terrell attempted to claim that the Oak Tree Country Club expenses were a business expense, but the evidence did not support such claim.  The only proven business-related use of the membership was to hold the 1997 company Christmas party there.  Poindexter testimony.

***Additional Evidence Specifically Relating to Willful Evasion or Defeat of Taxes***

105.     Between the time he submitted his 2008 OIC on December 12, 2008, and the time he filed his schedules in his 2010 bankruptcy on November 17, 2010, Terrell appears to have made considerable principal payments with respect to the note and mortgage on his home.  The 2008 OIC, Exhibit 51, states the fair market value of Terrell's home at $275,000 and the outstanding mortgage as $204,168.81.  Less than two years later, his 2010 Schedules A and D lists the fair market value at $320,580 and the outstanding mortgage as $170,000.  Exhibit 23 at pp. 3, 8.

106.     Several months after Terrell's 2010 bankruptcy case closed, and immediately prior to filing his 2011 OIC offering to pay only $2,000 (a very small fraction of the taxes he owed), Terrell vacationed in Israel.  Terrell testimony, Tr. 1, p.153; Exhibit 123.

107.     While Terrell's 2011 OIC was pending, he incurred the following expenses:

(a)     During late December 2011 and early January 2012, Terrell vacationed in Puerto Vallarta, Mexico.  Terrell testimony, Tr. 1, p. 153; Exhibit 123.

(b)     On February 23, 2012, Terrell spent almost $5,000 at Golf USA in Oklahoma City.  Terrell testimony, Tr. 1, p. 157; Exhibit 127.

(c)     Also in February 2012, Terrell wrote a check to his son in the amount of $9,500 for a vacation in Hawaii.  Terrell testimony, Tr. 1, p. 154-55; Exhibit 85.

(d)     Several months later, in April 2012, Terrell vacationed in Hawaii, paying for all of his family's expenses.  Terrell testimony, Tr. 1, p. 154; Exhibit 123.

26

(e)      During April and May 2012, Terrell incurred expenses of almost

$2,000 at Plantation Golf Co.  Exhibit 127.

108.      Between December 2012 and March 2017, Terrell continued to incur expenses for

travel to Las Vegas, Disney World, cruises, and more.  Altogether, the IRS quantified $30,794.05

vacation-related expenses between August 2008 and March 2017, exclusive of airfare.  Exhibit

123.  According to the IRS, Terrell's airfare expenses between August 2010 and August 2017

totaled $18,060.  Exhibit 126.

109.      Since at least 2008, Terrell has routinely spent hundreds of dollars a month on

non-medically prescribed health and wellness products.  All tolled, for the period 2008 to

February 2017, the IRS quantified health and wellness expenses of $51,975.14.  Exhibit 125.

110.      Between February 2011 and April 2017, the IRS quantified expenses of

$25,262.57 incurred by Terrell for seminar fees.  Exhibit 121.

111.      Between December 2008 and June 2017, the IRS quantified investment expenses

of $69,969.05 incurred by Terrell.  Exhibit 124.

112.      At some point, Terrell became a member of Ranch Country Club, located in

Westminster, Colorado.  Between July 2014 and July 2017, Terrell spent over $20,000 on Ranch

Country Club fees and expenses.  Terrell testimony, Tr. 1, p. 166; Exhibit 122; Pretrial Order

at p. 14.

113.      Between February 2012 and May 2016, the IRS quantified golf-related expenses

(independent of the Ranch Country Club fees) of $21,649.22 incurred by Terrell.  Exhibit 127.

114.      For the tax years 2008 to 2016, Terrell took charitable contribution deductions on

his tax returns in the total amount of $42,041.  Exhibit 129.

27

115.    On June 27, 2017, Terrell wrote a letter to Senator Jim Inhofe of Oklahoma thanking him for his and his staff's "help in my IRS matter."  In that letter, Terrell stated "When we left Criminal Court that day, I felt we had won and it was finally behind me . . . But my attorney said 'they will probably come after you on the civil side now.'"  Terrell's letter to Senator Inhofe also suggests that the IRS is targeting him because he is a "Conservative Christian businessman."  Exhibit 58.

116.    Nevertheless, at trial Terrell testified that after he made payment of the restitution ordered by the District Court in the amount of $16,422, he believed the "IRS was paid in full," and "they would not be coming after [him] for any more money."  Terrell testimony, Tr. 2, p. 7.

### *Credibility of the Witnesses*

117.    The Court found Day, Poindexter, and Calvert all to be credible witnesses, but it cannot say the same of Terrell.

118.    When being examined by counsel for the IRS, Terrell was evasive, uncooperative, defensive, and often pretended to be confused.  His testimony was inconsistent with prior depositions and requests for admission.  Terrell repeatedly gave gratuitous information beyond the scope of the question asked, even after being admonished not to do so by the Court.  He remembered very little and would have the Court believe he never read anything he ever signed, even important documents submitted to the IRS, which must be signed under penalty of perjury. However, when being examined by his counsel, Terrell had a completely different temperament

28

and demeanor, a much better memory, and much improved mental acuity.[13]  In other words,

Terrell was far from a credible witness.

## CONCLUSIONS OF LAW

The Bankruptcy Code endeavors to provide the honest but unfortunate debtor a fresh

start, but at the same time, it may not be used as a tax evasion device.  Dalton v. IRS, 77 F.3d

1297, 1300-01 (10th Cir. 1996).  While a fresh start unburdened by what may be an

overwhelming liability for accumulated taxes is consistent with its goals, the Bankruptcy Code

acknowledges that not all tax debts are created equal and, therefore, excepts certain categories

from discharge pursuant to Section 523(a)(1).  See Griffith v. United States (In re Griffith),

206 F.3d 1389, 1395 (11th Cir. 2000).  Relevant here is Section 523(a)(1)(C), which provides:

> (a)  A discharge under section 727 . . . of this title does not
> discharge an individual debtor from any debt—
>
> (1)  for a tax or a customs duty—
>
>     . . .
>
>     (C)   with respect to which the ***debtor made a
>     fraudulent return*** or ***willfully attempted in any
>     manner to evade or defeat such tax***[.]

Thus, there are two prongs –  or two different types of activity by a debtor – that can lead to

nondischargeability of taxes under Section 523(a)(1)(C):  (i) filing a fraudulent return; or

(ii) attempting to evade or defeat a tax obligation.  The Section 523(a)(1)(C) exception to

discharge contains no time restrictions or limitations period.  As a result, any tax liability

involving a fraudulent return or a willful attempt to evade or defeat payment of the tax liability is

---

[13]The disparity in his demeanor was so flagrant that the Court was compelled to admonish
Terrell during the trial.

nondischargeable, regardless of when it arose.[14]  Klayman v. United States (In re Klayman),

333 B.R. 695, 699 (Bankr. E.D. Pa. 2005);  Myers v. IRS (In re Myers), 216 B.R. 402, 405

(6th Cir. BAP 1998).  Like other exceptions to discharge, Section 523(a)(1)(C) must be strictly

construed in favor of the debtor.  United States v. Fegeley (In re Fegeley), 118 F.3d 979, 983

(3[d] Cir. 1997) (citing Dalton v. IRS., 77 F.3d at 1300).

      Terrell filed this adversary proceeding seeking a determination that his 1998 and 1999

taxes were discharged by his 2010 bankruptcy filing.  The IRS argues Terrell's 1998 and 1999

taxes are not dischargeable because Terrell **both** filed fraudulent returns **and** willfully evaded

payment of taxes owed for those years.  Although Terrell is the plaintiff in this proceeding, as

creditor, the IRS bears the burden of proving by a preponderance of the evidence that the taxes

are nondischargeable.  Dalton, 77 F.3d at 1302 (citing Grogan v. Garner, 498 U.S. 279, 291

(1991)).  Based on the analysis below, the Court concludes that Section 523(a)(1)(C) excepts

Terrell's 1998 and 1999 taxes from his discharge.

---

      [14]This is consistent with treatment of fraudulent returns and evasion of taxes under the
Internal Revenue Code.  Title 26 U.S.C.A. § 6501(c) provides as follows:

> (1) False return. – In the case of a false or fraudulent return with
> the intent to evade tax, the tax may be assessed, or a proceeding in
> court for collection of such tax may be begun without assessment,
> at any time.

> (2) Willful attempt to evade tax. – In case of a willful attempt in
> any manner to defeat or evade tax imposed by this title (other than
> tax imposed by subtitle A or B), the tax may be assessed, or a
> proceeding in court for the collection of such tax may be begun
> without assessment, at any time.

## I.    TERRELL'S 1998 AND 1999 TAXES ARE NOT DISCHARGEABLE BECAUSE HE FILED FRAUDULENT RETURNS.

### A.    Elements and Evidence for Establishing a Fraudulent Return.

A discharge under Section 727 does not discharge an individual debtor from any debt for a tax with respect to which the debtor made a fraudulent return.  The elements of a claim for nondischargeability under Section 523(a)(1)(C) based on a fraudulent return are similar to both (i) the fraud and false statements criminal offense in Section 7206(1) of the Internal Revenue Code,[15] see ¶ 56 above, and (ii) the standard for justifying the imposition of a civil fraud penalty under Section 6663 of the Internal Revenue Code.[16]  United State v. Krause (In re Krause), 386 B.R. at 824; Dagostini v. Wisconsin Dep't of Revenue (In re Dagostini), 482 B.R. 597, 600 (Bankr. E.D. Wis. 2012); Sommers v. IRS (In re Sommers), 209 B.R. 471, 481 (Bankr. N.D. Ill. 1997).  Thus, analysis contained in nonbankruptcy tax fraud cases is often instructive.

The IRS may prove Terrell filed fraudulent returns for tax years 1998 and 1999 within the meaning of Section 523(a)(1)(C) by establishing that he:  (1) had knowledge of the falsehood of the returns; (2) had an intent to evade taxes; and (3) underpaid his taxes.  Krause, 386 B.R. at 824 (citing In re Fliss, 339 B.R. 481, 486 (Bankr. N.D. Iowa 2006); Schlesinger v. United States

---

[15]26 U.S.C.A. § 7206 provides "Any person who – (1) Declaration under penalties of perjury. – Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony[.]"

[16]26 U.S.C.A. § 6663 provides "(a) Imposition of penalty. – If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.").  Although the analytical framework is the same, civil fraud penalty cases require the IRS to prove fraud by clear and convincing evidence.  See 26 U.S.C.A. § 7454(a); Tax Court Rule 142.

(In re Schlesinger), 290 B.R. 529, 536 (Bankr. E.D. Pa. 2002)).  See also Estate of Trompeter v.

Comm'r of Internal Revenue, 279 F.3d 767, 773 (9th Cir. 2002) (quoting Conforte v. Comm'r,

692 F.2d 587, 592 (9th Cir. 1982) ("A debtor makes a 'fraudulent return' if he knowingly states a

falsehood on his tax returns and specifically intends to avoid federal taxes.")).  A tax return is

considered fraudulent in its entirety if it contains any fraudulent item.  Foxworthy, Inc. v. C.I.R.,

T.C. Memo 2009-203, 2009 WL 2877750, *14 (T.C. 2009); In re Harris, 59 B.R. 545, 548

(Bankr. W.D. Va. 1986).

     Because direct evidence of fraud is seldom demonstrated, a court may infer fraud from

the record after a survey of the taxpayer's entire course of conduct.  Patton v. Comm'r of Internal

Revenue, 799 F.2d 166, 171 (5th Cir. 1986); Ankerberg v. Comm'r of Internal Revenue, 115

T.C.M. (CCH) 1001 (T.C. 2018); Ernle v. Comm'r, 100 T.C.M. (CCH) 367, *4 (T.C. 2010)

(court may draw inferences from taxpayer's entire course of conduct).  In other words, the IRS

may prove fraudulent intent by circumstantial evidence, and a court may infer fraud from "any

conduct, the likely effect of which would be to mislead or to conceal."  Kosinski v. Comm'r of

Internal Revenue, 541 F.3d 671, 679-80 (6th Cir. 2008) (quoting Richardson v. Comm'r, 509 F.3d

763, 743 (6th Cir. 2007) (internal quotation marks omitted)).  Further, a court's analysis of a

taxpayer's conduct under Section 523(a)(1)(C) should include both acts of commission and acts

of omission.  Toti v. United States (In re Toti), 24 F.3d 806, 809 (6th Cir. 1994).

     A taxpayer's conduct *prior* to filing a tax return is relevant evidence concerning whether

the taxpayer's subsequent actions were the result of honest mistake or deliberate evasion.  Matter

of Birkenstock, 87 F.3d 947, 951 (7th Cir. 1996) (pattern of debtor's behavior is relevant).  See

also United States v. Daraio, 445 F.3d 253, 264 (3[d] Cir. 2006) (defendant's past taxpaying record

is admissible to prove willfulness circumstantially).  A taxpayer's conduct *subsequent* to filing a

tax return may also be used to establish fraud.  United States. v. Voorhies, 658 F.2d 710, 715

(9th Cir. 1981) (so-called badges of fraud may be established by acts both prior and subsequent to

the indictment period may be probative of the defendant's state of mind).  For example, courts

have attributed importance to post-filing actions and tactics employed by taxpayers and/or

counsel that are calculated to prevent meaningful resolution of their case.  See Stringer v.

Comm'r of Internal Revenue, 84 T.C. 693, 715 (T.C. 1985), aff'd sub nom. 789 F.2d 917 (4th Cir.

1986).  In sum, even in criminal cases, evidence of a taxpayer's questionable tax compliance,

both in years before and after the years in question, is probative of a taxpayer's willfulness and

intent to evade taxes.  United States v. Upton, 799 F.2d 432, 433 (8th Cir. 1986).

The Fifth Circuit Court of Appeals has held that consistent understatement of income

with consequent underpayment of taxes is strong evidence of the intent to evade taxes required

for a finding of fraud.  Patton, 799 F.2d at 171.  See also Holland v. United States, 348 U.S. 121,

139 (1954) (determining that "evidence of a consistent pattern of underreporting large amounts

of income . . . support[s] an inference of willfulness"); Temple v. Commissioner, T.C. Memo.

2000–337, *9 (T.C.), aff'd, 62 F. App'x 605 (6th Cir. 2003) ("Consistent failure to report

substantial amounts of income over a number of years is, standing alone, highly persuasive

evidence of fraudulent intent.").  But omission of income is not the only form of taxpayer

misconduct that results in a finding of fraud.  Fraudulent intent can also be inferred from a

taxpayer's wrongful overstatement of a deduction or the claiming of an unallowable exemption

or credit.  For example, in the context of disallowed deductions, fraud has been found where

purely personal or capital items are claimed as current business expenses.  Ramsey v. Comm'r of

Internal Revenue, T.C. Memo 1984-251, 1984 WL 14497 (T.C.).  Further, a taxpayer's failure to maintain accurate records "'is a strong indicium of fraud with intent to evade taxes.'"  Cole v. Comm'r of Internal.Revenue, 637 F.3d 767, 781 (7th Cir. 2011) (quoting Toushin v.Comm'r, 223 F.3d 642, 647 (7th Cir. 2000)).

### B.    Terrell Filed Fraudulent Returns for Tax Years 1998 and 1999.

The record before this Court is replete with evidence to support a determination of nondischargeability of Terrell's taxes under Section 523(a)(1)(C) for filing fraudulent income tax returns for tax years 1998 and 1999.  Terrell's conduct ***before*** and ***after*** his filing of the returns in question on April 15, 1999, and April 17, 2000, reflect numerous circumstantial hallmarks of fraud:  (i) a failure to maintain accurate business records; (ii) a multitude of false statements made under penalty of perjury; (iii) concealment of assets from both the IRS and the bankruptcy court; (iv) the constant formation of new corporations under which to conduct the same continuing business with the admitted goal of evading creditors; and, last but not least, (v) a plea of guilty to filing a fraudulent return for tax year 1997.

### 1.    Terrell Failed to Remit Trust Fund Taxes, Concealed Assets, and Made False Statements in Connection with the 1999 and 2000 OICs Submitted to the IRS.

Terrell's failure to pay over employment (income and FICA) taxes withheld from the paychecks of "Terrell Roofing Corporation's" employees is the first of many indicia of his cavalier attitude towards legal tax duties and obligations.  As owner and president of his business, Terrell was a responsible party[17] for collecting, accounting for, and/or paying the

---

[17]For the definition of responsible party, see 26 U.S.C. §§ 6671(b), 6672; Johnson v. United States (In re Johnson), 283 B.R. 694, 701-02 (Bankr. N.D. Tex. 2000).

employment taxes to the IRS.  See Exhibit 40, p. 8765.  In the second half of 1997 and the first half of 1998, Terrell failed to remit trust fund taxes in the amount of $117,518.53.  See ¶ 25 above.  Additionally, toward the end of that period (June 1998), Terrell formed a new corporation to conduct business under – Terrell Home Center, Inc. – and the Court seriously doubts that is mere coincidence.  Terrell even admitted that he changed the name of his business to avoid creditors, and the Court feels certain that includes the IRS.  See ¶ 6 above.

Although he may have formed a new corporation in an attempt to protect his business assets, as a responsible party, Terrell could not escape personal liability for the employment taxes of Terrell Roofing Corporation.  Nonremittance of trust fund taxes withheld from employees' paychecks is effectively stealing from the U.S. Treasury.  United States v. David D. Patton & Assoc., P.C., 2012 WL 53899325 (E.D. Mich. 2012).  Therefore, a responsible party is subject to the trust fund recovery 100% penalty imposed by Section 6672 of the Internal Revenue Code.[18]  Terrell consented to assessment and collection of the penalty on August 13, 1999, but then attempted to compromise the debt by filing an OIC.

The Internal Revenue Code authorizes compromises of tax liabilities (usually by filing an OIC) when it is unlikely that the tax liabilities can be collected in full.  26 U.S.C. § 7122.  During the pendency of an OIC, the IRS is prohibited from collecting the unpaid taxes by levy or proceeding in court.  26 U.S.C. § 6331(k).  Generally speaking, the IRS will not accept an OIC

---

[18]26 U.S.C. § 6672 provides in pertinent part:  "(a) General rule. – Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over[.]"

unless the amount the taxpayer proposes to pay is equal to or greater than the "reasonable

collection potential." <u>Chandler v. Comm'r of Internal Revenue</u>, 660 F. App'x 694, 696 (10th Cir.

2016) (citing <u>Murphy v. Comm'r</u>, 469 F.3d 27, 33 (1st Cir. 2006) (explaining IRS "will not

accept a compromise that is less than the reasonable collection value of the case")).  Therefore, in

order for the OIC program to work properly, it is necessary for taxpayers to make adequate

compromise proposals consistent with their ability to pay and to provide reasonable

documentation to verify their ability to pay.  <u>See</u> Internal Revenue Manual 1.2.14.1.17 Policy

Statement 5-100.[19]  Additionally, after 2006, when a lump sum offer of compromise is made, the

taxpayer's OIC submission is required to be accompanied by payment of 20% of such lump sum

offered.  If a compromise offer consists of periodic installment payments by the taxpayer over

time, the first proposed installment payment must be made with submission of the OIC.

26 U.S.C. § 7122(c).

Beginning with the first OIC he filed in November 1999, Terrell ***repeatedly*** used the OIC

process not as a sincere attempt to pay such part of his tax liabilities that he was legitimately able

to pay, but instead as a ploy to delay paying taxes and prevent the IRS from being able to take

collection action.  Terrell's 1999 OIC offered to pay only $500 of the $117,518.53 penalty.  <u>See</u>

¶ 27 above.  Terrell claimed insufficient assets and income to pay the taxes but was not

forthcoming with truthful information.  In fact, the 1999 OIC was incomplete and/or inaccurate

and, therefore, did not accurately portray Terrell's actual financial condition and ability to pay.

First and foremost, Terrell did not disclose his business interests in or ownership of Terrell's,

---

[19]Available at 2007 WL 2989267, 1;  https://www.irs.gov/irm/part1/irm_01-002-014.

Inc., Terrell's Siding, Inc., Terrell Home Center, Inc., or Infotel Solutions, Inc.  In fact, he

provided no information whatsoever about his business interests, other than to identify himself as

"sales manager of Terrell Home Center."  Further, Terrell failed to disclose a personal bank

account in Mrs. Terrell's name.  See ¶¶ 28-29 above.  Moreover, less than a month after

submitting the 1999 OIC, Terrell dissolved Terrell's, Inc. and Terrell's Siding, Inc., having

already incorporated Terrell Home Center, Inc. in June 1998.  See ¶¶ 5, 30 above.

In July 2000, Terrell was again interacting with the IRS regarding nonremittance of trust

fund taxes, this time with respect to Infotel Solutions, Inc.  Terrell submitted another OIC in

September 2000 with respect to both Terrell Roofing Corporation's and Infotel Solutions, Inc.'s

outstanding employment taxes, again offering to pay a measly $500.  Like the 1999 OIC, the

2000 OIC was demonstrably false and misleading, containing only outdated 1999 information

similar to that given in connection with the previously submitted 1999 OIC, and most

importantly, again failing to disclose his business interests.  See Exhibit 43.

In connection with the 2000 OIC, Terrell, once more, blatantly lied to the IRS, under

penalty of perjury, by stating that he never owned the assets of Terrell Home Center, Inc., and

that his wife was president of the corporation.  However, by that time, Terrell had already

withdrawn all the funds in Terrell Home Center, Inc.'s bank account and formed a new

corporation named T-Square, L.L.C. (not disclosed on the 2000 OIC), leaving Terrell Home

Center, Inc. with zero assets and $610,000 in liabilities.  See ¶¶ 31-39 above.  The 2000 OIC

remained pending from September 2000 at least through March of 2001, staying the IRS's levy

or collection.  Nevertheless, during that time period, Terrell purchased two new Acuras paying

$5,000 in cash toward each purchase.  See ¶ 35 above.

Thus, when the IRS detected Terrell's nonremittance of the employment taxes and sought to impose a penalty on him, Terrell attempted to compromise the penalty but did not deal with the IRS in a forthcoming or good faith manner. He obfuscated his true circumstances rather than providing all relevant information while simultaneously transferring his business operations to new corporations to escape detection. As discussed further below, Terrell repeats this concealment of assets and true financial condition numerous times with respect to OICs and even bankruptcy filings. The Court concludes Terrell's pattern of conduct – his consistent failure to disclose assets in legal documents made under penalty of perjury – is circumstantial evidence that Terrell knowingly filed fraudulent returns for tax years 1998 and 1999.

### 2.     Terrell Failed to Disclose Assets on the 2001 Bankruptcy Schedules.

In April 2001, after Terrell learned the IRS had begun investigating his personal income tax returns, the Terrells filed for chapter 7 bankruptcy relief. The bankruptcy petition triggered the Section 362 automatic stay, again protecting Terrell from any collection efforts by the IRS. In his 2001 chapter 7 filing, Terrell failed to schedule ownership of his home improvement business. His 2001 schedules portray Terrell as a salesman employed by "Terrell's" (a corporation no longer in existence) for a period of one month with monthly gross wages of $1,000, rather than the 100% owner of a home improvement business in continuous operation in Oklahoma City since the early 1980s (probably under the corporate name T-Square, L.L.C. at that time). See ¶ 42 above. In addition to concealing assets, Terrell failed to accurately schedule his tax obligations. Terrell's Schedule E lists a debt of only $50,000 to the IRS, with no additional information provided. However, at that time, he was actively negotiating with the IRS via submission of OICs with respect to the trust fund penalty of at least $117,518.53, a

38

nondischargeable tax, see Section 507(a)(8)(C), with respect to which he had already consented to assessment and collection.

Moreover, Terrell's schedules indicated he had $100 cash on hand and no checking, savings, or other bank accounts, yet during the pendency of the 2001 bankruptcy case, he purchased a 2002 Acura MDX with a $41,000 cashier's check.  A few months later, the Terrells received a bankruptcy discharge wiping their slate clean, but their creditors received no distribution whatsoever.  See ¶¶ 42, 43, 46, 47 above.

### 3.    Terrell Filed a Fraudulent 1997 Tax Return.

In October of 1998, Terrell filed an admittedly fraudulent personal income tax return for tax year 1997.  After the 2001 bankruptcy case was closed in 2003, the IRS pursued its criminal investigation of the Terrells with respect to tax years 1997, 1998, and 1999.  Terrell eventually pled guilty to filing a fraudulent 1997 return.  On his 2005 Petition to Enter Plea of Guilty, Terrell stated his employer as "Terrell's, Inc." even though that corporation had been dissolved in 1999 and never identified himself as a business owner.  See ¶ 54 above.  During the sentencing hearing, Terrell admitted to reporting only $10,000 in income for 1997 when he knew he had income close to $130,000.  See ¶¶ 53, 57 above.

Terrell's admission about his 1997 tax return gives the Court reason to believe he also knowingly filed fraudulent returns for tax years 1998 and 1999 in April 1999 and April 2000, respectively.  This is especially the case when considered together with Terrell's other evasive actions during the relevant time period:  (i) Terrell submitted OICs in 1999 and 2000 with respect to trust funds taxes in which he neglected to divulge his business ownership interests; (ii) Terrell dissolved corporations and formed new corporations to carry on the same business in an effort to

avoid creditors (see footnote 5); and (iii) Terrell failed to disclose assets in his 2001 chapter 7 bankruptcy case.

Further, in his 1997 fraudulent return Plea Agreement, Terrell admitted that there was a tax loss to the IRS for tax years 1998 and 1999. The Plea Agreement states that "[i]f defendant enters a plea of guilty as described above and fully meets all obligations under this agreement, he will not be further prosecuted by the United States for any crimes related to his participation in making and subscribing false tax returns during the period from 1998 through 2000." See ¶ 56(b) above. Clearly, the IRS was investigating Terrell's 1998 and 1999 returns as fraudulent and believed it could have charged him with a criminal offense for those tax years, and its forbearance was part of the consideration for Terrell's guilty plea for tax year 1997.

Additionally, following Terrell's criminal judgment and sentencing, he signed IRS Form 4549 consenting to assessment and collection of taxes for tax years 1998 and 1999, *including civil fraud penalties*. See ¶ 65 above. Terrell's signature on the Form 4549 may not be a legally binding admission by Terrell that he filed fraudulent returns, but it constitutes another valuable piece of circumstantial evidence to take into consideration.

### 4. Terrell Concealed Assets and Made False Statements in Connection with the 2008 OIC Submitted to the IRS.

After the IRS assessed the 1997-1999 tax deficiencies and fraud penalties and issued notices of intent to levy, Terrell filed another OIC in May 2007. The 2007 OIC was rejected by the IRS, but Terrell followed it up with yet another OIC in December 2008. Terrell's 2008 OIC offered to pay only one percent of the more than $1,500,000 in taxes, interest, and penalties owed. He proposed to pay $15,831.19 by remitting $500 with the 2008 OIC submission and then

making 23 monthly installments of $500 and a final payment of $3,831.19. He did not remit the first $500 payment with his 2008 OIC. Exhibits 4 & 5. Moreover, the 2008 OIC once again neglected to disclose any information about his business interests. Instead, Terrell claimed to be a self-employed contractor with monthly income of $2,481. The 2008 OIC remained pending until Terrell withdrew it in June 2009. See ¶¶ 66-73 above.

### 5.   Terrell Failed to Disclose Assets on His 2010 Bankruptcy Schedules.

After Terrell withdrew the 2008 OIC and the IRS issued notices of intent to levy, Terrell filed his 2010 chapter 7 bankruptcy case staying any IRS action against him. Terrell's 2010 Schedule B listed ownership of 1,000 shares of "Terrills Siding" valued at zero. His Schedule I states his occupation as owner of "Terrill's Siding" (employed 9 years) with gross monthly wages of $2,766.67. Similarly, Terrell's 2010 statement of financial affairs regarding nature, location and name of business, discloses only "Terrill's Siding." However, Terrell's Siding, Inc. was dissolved as a corporation in 1999, more than ten years prior to Terrell's 2010 bankruptcy filing. Instead, the home improvement business was likely being operated under David Terrell, Inc., incorporated in 2005, which Terrell did not disclose in his schedules or statement of financial affairs.

Terrell's 2010 Schedule E lists a debt to the IRS in the amount of $95,000, but no further information is given regarding the type of tax or year to which the taxes related. The amount of tax liabilities, as well as the lack of detail, is surprising given that Terrell (i) had been under investigation by the IRS with respect to personal income taxes for 1997, 1998, and 1999, and in 2005 plead guilty to filing a fraudulent tax return for 1997, (ii) thereafter consented to assessment and collection of tax deficiencies and fraud penalties by signing Form 4549, and

(iii) subsequently submitted the 2008 OIC to the IRS attempting to compromise his outstanding tax liabilities of over $1,500,000 (with no payments on such debt having been made in the interim). Notwithstanding Terrell's nondisclosure of assets, as in his previous bankruptcy case, the trustee filed a report of no distribution, i.e., Terrell received a discharge, and his creditors received nothing. See ¶¶ 75-81 above.

**6.    Terrell Failed to Maintain Accurate Business Records Which Led to Understatement of Income on His Tax Returns.**

As noted above, a taxpayer's failure to maintain accurate records is a strong indicum of fraud with intent to evade taxes. Terrell did not maintain adequate records because, according to Calvert, "one set of books had to be separated into two sets of books" by the IRS agents during their criminal investigation of Terrell. See ¶ 52 above. But, moreover, the IRS produced concrete evidence that Terrell both neglected to report numerous items of income and overstated legitimate deductions from his business income by paying personal expenses. First, in both 1998 and 1999, Terrell deposited checks representing business income into the Terrells' personal checking accounts. Second, in 1998, the Terrells neglected to report rental income from the Tates who were renting his Barrington Lane home. Third, in 1999, the Terrells neglected to report the income on their return from two separate Forms 1099-MISC issued to Jackson (formerly Mrs. Terrell), one from a third party, but the other from "Terrell Home Center, Inc." And fourth, in both 1998 and 1999, Terrell had his corporation pay personal expenses but did not book them to his draw account so that a Form 1099 could be issued to report income on the Terrells' returns. See ¶¶ 103, 104 above.

42

At trial, Terrell admitted he knew that personal expenses paid by his company should be booked to his draw account and that they should be reported as income to him on a Form 1099. But no Form 1099 was issued to Terrell for this purpose in either tax year 1998 or 1999. The Court would perhaps understand a personal expense here or there inadvertently not being recorded in Terrell's draw account and then reported as income on a Form 1099. However, in this case, no personal expenses whatsoever were recorded to the draw account – not even monthly recurring car payments and country club fees. Therefore, no Form 1099 was issued. Failure to report personal expenses paid by one's business is a "type of unreported income the courts view with disfavor." Krause, 386 B.R. at 825-26. Evidence in this regard supports a conclusion that Terrell intentionally misstated his income for tax purposes. In addition, the Court surmises that the family car payments, country club fees, deck expenses, and purchase of the elliptical machine were probably only the tip of the iceberg, considering the IRS had no business books or records to work with and was forced to build its case primarily on bank records it obtained.[20]

### 7. Terrell's Argument That He Relied on His Tax Accountant Has No Merit.

Terrell's primary excuse for filing "inaccurate" tax returns in 1998 and 1999 is that he relied on his tax accountant. This does not, however, mitigate Terrell's culpability. Bernstein v.

---

[20]Since conventional wisdom is to retain business books and records and tax documentation for a period of seven years, at first blush, it may seem normal for Terrell to no longer have books and records from twenty years ago. However, the IRS first contacted Terrell in 1999 about unpaid employment trust fund taxes, and shortly thereafter, began investigating his personal income tax returns for tax years 1997 to 1999. Because Terrell has been under investigation since that time and has continuously sought to compromise the tax deficiencies with the IRS and/or discharge them in bankruptcy, Terrell cannot be absolved from neglecting to keep his books and records.

United States (In re Bernstein), 2017 WL 3314242, at *6 (Bankr. D. N.J. June 7, 2017).  "In general, individuals are charged with knowledge of the contents of documents they sign–that is, they have 'constructive knowledge' of those contents."  Consol. Edison Co. of N.Y., Inc. v. United States, 221 F.3d 364, 371 (2ᵈ Cir. 2000).  "A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents."  United States v. Williams, 489 F. App'x 655, *4 (4ᵗʰ Cir. 2012) (quoting Greer v. Comm'r of Internal Revenue, 595 F.3d 338, 347 n. 4 (6ᵗʰ Cir. 2010));  United States v. McBride, 908 F. Supp. 2d 1186, 1206 (D. Utah 2012) (taxpayer's signature on return is sufficient proof of  knowledge of instructions contained in tax return form).

Moreover, Terrell had an obligation to provide his tax accountant with full and accurate tax-related information.  In the absence of personal expenses paid by Terrell's business being booked to his draw account, Terrell's tax accountant would have no way of knowing whether a check to "UMB Oklahoma Bank" or "Bank One," without further notation, was a car payment for a vehicle driven by one of Terrell's family members and a personal expense.  Any attempt by Terrell to shift the blame to his accountant requires Terrell to establish that:  (1) he provided the preparer full disclosure of tax-related information; (2) he took no steps to mislead the preparer; and (3) he filed the return as prepared without having reason to believe it was incorrect.  United States v. Bednarik, 828 F.2d 20, *3 (6ᵗʰ Circuit 1987) (citing United States v. Claiborne, 765 F.2d 784, 798 (9th Cir. 1985), cert. denied, 106 S. Ct. 1636 (1986)).  Terrell proved none of the above.  The bottom line is that Terrell signed and filed his 1998 and 1999 tax returns that reported no 1099 income for the personal expenses paid by his business knowing there should have been 1099 income.  As so aptly summed up by the Seventh Circuit:

> [P]eople who sign tax returns omitting income or overstating
> deductions often blame their accountant or tax preparer.  But these
> arguments never go anywhere.  People are free to sign legal
> documents without reading them, but the documents are binding
> whether read or not.

Novitsky v. American Consulting Engineers, L.L.C., 196 F.3d 699, 702 (7th Cir. 1999).

Based on Terrell's conduct prior to 1999, during 1999 and 2000, and after 2000, the

Court finds there is more than sufficient evidence to conclude Terrell filed fraudulent income tax

returns for tax years 1998 and 1999, and, therefore, those taxes were not discharged in his 2010

bankruptcy case.

## II.    TERRELL'S 1998 AND 1999 TAXES ARE NOT DISCHARGEABLE BECAUSE HE WILLFULLY EVADED AND DEFEATED PAYMENT OF THOSE TAXES.

In addition to contending Terrell filed fraudulent returns, the IRS argues Terrell's 1998

and 1999 taxes are not dischargeable because Terrell willfully evaded or attempted to defeat

those taxes.  As discussed below, the Court agrees.

### A.    Elements and Evidence for Establishing Willful Evasion or Defeat of Taxes.

Whether or not a debtor has willfully attempted to evade or defeat a tax for purposes of

Section 523(a)(1)(C) is a question of fact.  Vaughn v. United States (In re Vaughn), 765 F.3d

1174, 1180 (10th Cir. 2014).  A debtor's failure to pay a tax obligation, in and of itself, does not

compel a finding of nondischargeability on the basis of evasion.  Dalton, 77 F.3d at 1301 (citing

Haas v. IRS (In re Haas), 48 F.3d 1153, 1158 (11th Cir. 1995)).  "Rather, nonpayment is relevant

evidence which a court should consider in the totality of conduct to determine whether or not the

debtor willfully attempted to evade or defeat taxes."  Dalton, 77 F.3d at 1301 (citing

Commissioner v. Peterson (In re Peterson), 152 B.R. 329, 335 (D. Wyo. 1993)).  A taxpayer's

ability to pay is a factor to consider in determining if nonpayment of tax is willful, but it is not a requirement for willfulness. Grothues v. IRS (In re Grothues), 226 F.3d 334, 339 (5th Cir. 2000). Therefore, a taxpayer may be held to have willfully attempted to evade tax even if he lacked the financial resources to pay the tax. United States v. Doyle, 276 F. Supp. 2d 415, 424 (W.D. Pa. 2003). A taxpayer's earlier willful evasion of taxes is not somehow nullified by later coming clean with the IRS. Meyers v. IRS (In re Meyers), 196 F.3d 622, 625 (6th Cir. 1999).

In Vaughn v. United States, the Tenth Circuit Court of Appeals approved the Colorado bankruptcy court's use of a two-component test for establishing willful evasion of a tax obligation. Relying on the Sixth Circuit's opinion in United States v. Storey, 640 F.3d 739, 744 (6th Cir. 2011), the Vaughn bankruptcy court stated that there is both (1) a conduct requirement, and (2) a mental state requirement for willful evasion under Section 523(a)(1)(C), and then cited factual findings in support of the two elements separately. Vaughn, 765 F.3d at 1180.

Courts have considered many different types of conduct factors in assessing whether a debtor has willfully attempted to evade or defeat taxes. Those factors include, but are not limited to, the following acts of commission and culpable omission: (1) concealment of income and/or assets; (2) fraudulent transfers; (3) conducting business affairs in such a manner that is intended to make finding, tracking, or levying on income more difficult; (4) significant understatements of income; (5) repeated failure to file returns or habitually late filings in the wake of past compliance and governmental demands; (6) implausible or inconsistent behavior by the taxpayer; (7) failure to cooperate with the taxing authorities; and (8) frustrating tax collection efforts. See, e.g., United States v. Fegeley (In re Fegeley), 118 F.3d 979, 983-84 (3rd Cir. 1997); In re Zuhone, 88 F.3d 469, 473 (7th Cir. 1996); In re Birkenstock, 87 F.3d 947, 952 (7th Cir. 1996); Bruner v.

United States (In re Bruner), 55 F.3d 195, 200 (5th Cir. 1995); Toti v. United States (In re Toti),

24 F.3d 806, 808 (6th Cir. 1994); May v. Missouri Dep't of Revenue (In re May), 251 B.R. 714,

718 (8th Cir. BAP 2000); Laurin v. United States (In re Laurin), 161 B.R. 73, 75 (Bankr. D. Wyo.

1993).

Additionally, courts have focused on a debtor's unreasonable or lavish spending in the

face of outstanding tax obligations.  "[C]aselaw applying section 523(a)(1)(C) has consistently

held section 523(a)(1)(C)'s requirements to be satisfied in situations where the debtor – even

without fraud or evil motive – has prioritized his or her spending by choosing to satisfy other

obligations and/or pay for other things (at least for non-essentials) before the payment of taxes,

and taxes knowingly are not paid."  Lynch v. United States (In re Lynch), 299 B.R. 62, 64

(Bankr. S.D. N.Y. 2003).  See also United States v. Jacobs (In re Jacobs), 490 F.3d 913, 921

(11th Cir. 2007) ("large discretionary expenditures, when a taxpayer knows of his or her tax

liabilities, is capable of meeting them, but does not, are relevant to § 523(a)(1)(C)'s conduct

element").

The majority of courts addressing nondischargeability on the basis of willful evasion or

defeat of a tax, including this Court, have determined that the mental state requirement of Section

523(a)(1)(C) is met by showing that:  "(1) the debtor has a duty under the law; (2) the debtor

knew of that duty; and (3) the debtor voluntarily and intentionally violated that duty."  Vaughn,

765 F.3d at 1181 (citing Jacobs, 490 F.3d at 921).  See also United States v. Angel (In re Angel),

1994 WL 69516 (Bankr. W.D. Okla. 1994) (unpub.) (citing In re Toti, 149 B.R. 829, 834 (E.D.

Mich. 1993)).  "The willfulness required under § 523(a)(1)(C) is met if the actions are done

voluntarily, consciously, or knowingly and intentionally." Mills v. United States ex rel. IRS

(In re Mills), 337 B.R. 691, 699 (Bankr. D. Kan. 2005) (citing Dalton, 77 F.3d at 1302)).[21]

      **B.**      **Terrell Willfully Attempted to Evade and Defeat His 1998 and 1999 Taxes**.

          **1.**      **Terrell Had a Duty Under the Law To Pay His 1998 and 1999 Taxes and Was Aware of That Duty.**

There is no dispute that Terrell knew he originally had a duty to pay income taxes for tax

years 1998 and 1999. He filed income tax returns in April 1999 and April 2000, respectively,

signed them under penalty of perjury, and paid a minimal amount of tax. See ¶¶ 21-24 above.

The issue here is whether Terrell knew he had a continuing duty to pay additional 1998 and 1999

taxes assessed by the IRS in 2006 after the conclusion of his 1997 criminal tax matter and

following the discharge entered in his 2010 bankruptcy case.

Terrell disputes that "he knew he still had a duty" to pay the additional 1998 and 1999

taxes, arguing: (i) he thought that payment of the restitution ordered in his 1997 criminal case

was payment in full of his taxes for 1997, 1998, and 1999; and (ii) he believed his 1998 and 1999

tax debts were discharged in his 2010 bankruptcy case. The Court finds that neither of Terrell's

beliefs regarding possible extinguishment of his tax obligations is plausible and, further, that

both of his rationales cannot be true at the same time. In other words, if complete payment of his

---

[21]In Hawkins v. Franchise Tax Board, 769 F.3d 662 (9th Cir. 2014), the Ninth Circuit Court of Appeals held that for purposes of Section 523(a)(1)(C), willfully attempting to evade or defeat a tax debt "requires that the acts be taken with the specific intent to evade the tax." Hawkins, 769 F.3d at 670. But the Hawkins decision is not controlling in this jurisdiction, and the Court declines to adopt any such specific intent requirement. For more information, see Matthew Williams, Lavish Spending as Evidence of "Willful Tax Evasion:" How the Ninth Circuit's Requirement of "Specific Intent" in Hawkins Creates a Circuit Split and Facilitates Abuse of the Bankruptcy System, 68 Rutgers U.L. Rev. 517 (2015).

restitution satisfied all tax obligations, there would have been no need for them to be discharged in his 2010 bankruptcy case.

### a. Terrell's Asserted Belief That He No Longer Owed Taxes After Making Restitution is Not Credible.

In connection with his 2005 plea of guilty to filing a fraudulent 1997 tax return, Terrell was ordered to pay $16,422 in restitution. Terrell completed payment of the restitution in October 2008. See ¶¶ 60, 69 above. According to Terrell, he believed payment of the restitution was payment of all taxes for 1997, 1998, and 1999. However, Terrell's self-serving testimony in this regard is refuted by other evidence in the record. At trial, criminal tax attorney Calvert testified that Terrell's understanding was that the restitution ordered was the amount of his income taxes due for *1997* and that, when he made restitution, he would have paid his *1997* income taxes in full, not his 1998 and 1999 taxes, which are at issue here. Further, Calvert testified that he specifically advised Terrell that there would be a subsequent civil assessment of liabilities against him for tax years 1997, 1998, and 1999. See ¶¶ 60-61 above.

Terrell's own words and actions, both in the past and more recently, demonstrate the untruthfulness of Terrell's testimony that he believed restitution was payment in full of his outstanding tax liabilities. First, in October 2005, *after* Terrell had been sentenced and ordered to pay restitution, Terrell signed IRS Form 4549 consenting to assessment and collection of taxes for tax years 1997, 1998, and 1999. After addition of civil fraud penalties and interest, the amount owed by Terrell for 1998 and 1999 was nearly $400,000. The IRS then assessed the additional taxes due in January 2006 and issued notices of intent to levy with respect to those obligations. See ¶¶ 64-67 above. At trial, Terrell specifically admitted to repeatedly receiving notices from the IRS about the civil income tax assessments but chose to ignore them. Thus,

49

both the IRS's and Terrell's actions subsequent to conclusion of the criminal matter belie Terrell's suggested belief that payment of restitution in the amount of $16,422 satisfied all of his outstanding tax obligations.

Next, Terrell's acts of submitting OICs to the IRS in 2007 and 2008 attempting to compromise his outstanding tax obligations are contrary to his asserted belief regarding the effect of making restitution.  If Terrell truly believed that payment of restitution was payment in full of his taxes, there would have been no reason for him to submit OICs to the IRS in 2007 and 2008, *during and after* his payment of restitution.  In fact, Terrell's 2008 OIC acknowledged outstanding tax liabilities of over $1,500,000 and purported to relate to the **Trust Fund Recovery Penalties**, as well as personal and/or corporate income taxes for the thirteen tax years 1996 through 2008.  See ¶¶ 68-70 above.

Finally, in June 2017, only a year before trial of this matter, Terrell wrote a letter to Senator Jim Inhofe of Oklahoma complaining about the IRS's "targeting" of him as a "conservative Christian businessman."  In the letter, Terrell specifically acknowledged that at the conclusion of the 1997 criminal tax matter, Calvert told him the IRS would now come after him on the civil side.  See ¶ 115 above.

In sum, the Court does not accept as credible Terrell's argument that he believed the 1998 and 1999 tax obligations were discharged by completing payment of $16,422 in restitution in October 2008.  To do so would be nonsensical.

### b.  Terrell's Asserted Belief That He No Longer Owed Taxes After His 2010 Bankruptcy Case Is Not Credible.

Terrell also testified that he thought his 1998 and 1999 tax obligations were discharged in his 2010 bankruptcy case.  On the other hand, the IRS argues Terrell knew the taxes for 1998 and

50

1999 were not discharged because, in October 2011, after the conclusion of his bankruptcy case,

he submitted the 2011 OIC covering his 1997, 1998, 1999, 2008, and 2009 outstanding tax

obligations.   The Court agrees that Terrell's submission of the 2011 OIC supports the IRS's

contention that Terrell "knew he *still* had a duty" to pay these taxes subsequent to his 2010

discharge.

Additionally, the Court considers it telling that the only debt Terrell scheduled to the IRS

in his 2010 bankruptcy case was a priority debt of $95,000 (with no additional information) on

Schedule E.   Such a tax debt is one within Section 507(a)(8)[22] and, therefore, not one which is

---

[22](a) The following expenses and claims have priority in the following order:

> (8) Eighth, allowed unsecured claims of governmental units, only
> to the extent that such claims are for—
>
> (A) a tax on or measured by income or gross receipts for a taxable
> year ending on or before the date of the filing of the petition—
>
> > (i) for which a return, if required, is last due,
> > including extensions, after three years before the
> > date of the filing of the petition;
> >
> > (ii) assessed within 240 days before the date of the
> > filing of the petition, exclusive of—
> >
> > > (I) any time during which an offer in
> > > compromise with respect to that tax
> > > was pending or in effect during that
> > > 240-day period, plus 30 days; and
> > >
> > > (II) any time during which a stay of
> > > proceedings against collections was
> > > in effect in a prior case under this
> > > title during that 240-day period, plus
> > > 90 days; or

(continued...)

dischargeable.  Because no additional information was provided on Schedule E, the Court has no

way of knowing if all of the $95,000 scheduled tax debt in fact related to more recent taxable

years and was properly characterized as a priority debt under Section 507(a)(8) or whether that

$95,000 debt (or some part thereof) related to Terrell's 1998 and 1999 taxes.  However, neither

factual scenario lends any credence to Terrell's claim that he believed his 1998 and 1999 taxes

were discharged because he either (i) admitted he still owed the taxes and misclassified them as

priority nondischargeable taxes (requiring no action on the part of the IRS) or (ii) neglected to

schedule the reputedly dischargeable 1998 and 1999 taxes on Schedule F (and the IRS would not

have had notice of its need to challenge the alleged dischargeability of the taxes).

Under Section 523(a)(3)(A), a debt that is not scheduled in time to permit timely filing of

a proof of claim is not discharged unless such creditor had notice or actual knowledge of the case

in time for such timely filing.  The Court is aware that, based on a plain meaning reading of

Section 523(a)(3)(A), many courts, including the Tenth Circuit, hold that it has no impact on a

no-asset chapter 7 case, and, therefore, a debt is discharged regardless of whether or not the

debtor scheduled the claim.  In re Parker, 313 F.3d 1267, 1268-69 (10th Cir. 2002).  But the result

is different if the bankruptcy proceeding is identified as a "no asset" case because the debtor fails

---

[22](...continued)

> (iii) other than a tax of a kind specified in section
> 523(a)(1)(B) or 523(a)(1)(C) of this title, not
> assessed before, but assessable, under applicable
> law or by agreement, after, the commencement of
> the case[.]

11 U.S.C. § 507(a)(8).

to disclose assets.  Waterson v. Hall, 515 F.3d 852, 856 (8th Cir. 2008) (authorities holding that

Section 523(a)(3) does not apply in no-asset cases do not apply to an asset case and it does not

apply in a situation where there is an undisclosed asset).  Here, Terrell did not disclose ownership

of David E. Terrell, Inc., the corporation under which he was conducting his home improvement

business at the time of his 2010 bankruptcy filing.  At the end of the day, Terrell's bankruptcy

conduct did not rise to the level of fair dealing and put the IRS at a serious disadvantage without

notice that he was ostensibly attempting to discharge his 1998 and 1999 taxes.

The Court has already detailed Terrell's long history of concealing assets and income and

his failure to be honest and forthcoming with the IRS and the bankruptcy court.  In light of that

history, the Court highly doubts Terrell disclosed sufficient and proper information, if any

information at all, regarding the IRS's investigation and his criminal tax matter to his 2010

bankruptcy attorney.  Terrell did not testify that his bankruptcy attorney specifically advised him

that his 1998 and 1999 taxes would be discharged in his 2010 bankruptcy case.  Therefore, it is

difficult to fathom on what legitimate basis Terrell could possibly claim to believe his 1998 and

1999 taxes were dischargeable and/or discharged.

Moreover, a discharge in bankruptcy is a privilege, not a right, and "[a] debtor who has

not been honest and forthcoming – particularly in connection with the bankruptcy itself – does

not deserve that privilege."  Smith v. Drabik (In re Drabik), 581 B.R. 554, 561 (Bankr. N.D. Ill.

2018) (citing In re Juzwiak, 89 F.3d 424, 427 (7th Cir. 1996)).  A debtor who fails to disclose

assets and neglects to schedule tax debts he claims are dischargeable not only frustrates the IRS's

tax collection efforts – he unfairly manipulates the bankruptcy system beyond its intended

purpose.

Based on the foregoing, the Court concludes Terrell knew he had a continuing duty to pay the additional 1998 and 1999 taxes assessed by the IRS beyond paying his restitution in full as well as beyond the discharge he received in his 2010 bankruptcy case.

>    2.     **Terrell Willfully Violated His Duty to Pay the 1998 and 1999 Taxes by Concealing Income and Assets, Conducting Business Affairs in a Manner Intended to Make Finding, Tracking, or Levying on Income Difficult, Failing to Cooperate with the IRS, and Frustrating Tax <u>Collection Efforts</u>.**

Since nonpayment of a tax obligation only partially satisfies the conduct requirement of the test for willful evasion under Section 523(a)(1)(C), in order to obtain a nondischargeability determination, the IRS must also demonstrate additional acts of commission or culpable omission on Terrell's part and that he possessed the required mental state.  In this case, much of the evidence discussed above in connection with Terrell's filing of fraudulent returns also supports a conclusion that Terrell willfully attempted to evade or defeat his 1998 and 1999 taxes. To briefly restate, Terrell:  (i) dodged creditors, including the IRS, by continuously forming new corporations to carry on the same business; (ii) frustrated tax collection by repeatedly filing OICs with the IRS that were not in good faith (offering only trivial compromise amounts that did not represent his true ability to pay); and (iii) concealed assets and income when filing both OICs and bankruptcy schedules.  Additionally, Terrell frustrated tax collection by resisting discovery in this adversary proceeding, which he filed, and the IRS was forced to obtain a Court order compelling Terrell's cooperation.  <u>See</u>  ¶¶ 95 & 96 above.  All of Terrell's commissions and culpable omissions in this regard fall squarely within the group of factors courts have determined support a conclusion of willful evasion or defeat of taxes.

Other courts have specifically found that inaccurate information submitted with an OIC is evidence of evading or defeating payment of taxes. In an analogous Louisiana nondischargeability adversary proceeding, a debtor submitted an OIC to the IRS with Forms 443-A that under reported his income. That bankruptcy court reasoned that the clear implication of concealing income on the OIC forms was the debtor's attempt to defeat the IRS from collecting taxes owed. Therefore, the court held the debtor's taxes nondischargeable because "frustrating collection efforts" is evidence of willful tax evasion. Sudderth v. United States (In re Sudderth) 2002 WL 1058147, *4 (Bankr. E.D. La. 2002) (citing May v. Missouri Dep't of Revenue (In re May), 251 B.R. 714 (8th Cir. BAP 2000)). See also, Colish v. United State ex rel. IRS (In re Colish), 289 B.R. 523, 533-34 (E.D. N.Y. 2002) (repeated offers in compromise, very low in relation to tax obligations owed, to forestall collection constituted evasive behavior under § 523(a)(1)(C)); Feshbach v. United States Dep't of Treasury (In re Feshbach), 576 B.R. 660, 682 (Bankr. M.D. Fla. 2017) (multiple minimal OICs to the IRS while maintaining lavish spending and lifestyle was evidence of willful evasion).

Terrell may have testified that he did not intend to evade or defeat payment of his 1998 and 1999 taxes. But as the Court has already stated, Terrell simply was not a credible witness. As a result, Terrell's intent can be inferred from his conduct notwithstanding his contrary testimony. As other courts have pointed out, litigants in this type of case should heed the age-old adage that "actions speak louder than words." Zuhone, 88 F.3d at 472. In Zuhone, the bankruptcy court considered the government's proof that the debtors had conducted extremely dubious transactions during the time period the IRS was investigating and litigating against the

debtors to pay their taxes.  The bankruptcy court then considered the debtors' explanation for their conduct and simply found the testimony incredible.  The bankruptcy court explained:

> I found the testimony of the debtors was not credible.  When they began this journey to deceive the IRS and avoid these taxes, they did what people often do.  They became tangled in their own stories.

Zuhone, 88 F.3d at 472.  On appeal, the Seventh Circuit affirmed the bankruptcy court's determination that the debtors had willfully sought to evade or defeat their taxes.  The Seventh Circuit found some of debtors' explanations "laughable," concluding that once the debtors' proffered testimony was discredited, their actions spoke for themselves.  Zuhone, 88 F.3d at 472.

The Court finds the inconsistency between Terrell's words and actions similar to that of the Zuhone debtors.

### 3.  Terrell Neglected to Pay His Tax Debts While Making Substantial Expenditures on Nonessential Items.

The IRS contends the conduct requirement for willful evasion under Section 523(a)(1)(C) is also met because Terrell neglected to pay his outstanding tax debts while at the same time making substantial expenditures on various items that are not essential or necessary.  As set forth above in the Findings of Fact, these nonessential expenditures include purchases of new luxury vehicles, a multitude of expensive vacations, a plethora of golfing expenses, charitable contributions, vitamins, health supplements and juices, and discretionary investments.  See ¶¶ 105-114 above.  When combined, Terrell's questionable discretionary expenditures in the face of unpaid taxes total over $279,000.  Exhibits 128 and 129.

The Court finds that detailed analysis of the numerous expenditures is unnecessary – the bottom line is Terrell had resources with which he could have paid at least some of the

56

outstanding taxes he owed and simply chose not to.  Terrell's conduct in this regard is evidence that he willfully attempted to evade or defeat taxes.  United States v. Mitchell (In re Mitchell), 633 F.3d 1319, 1329 (11th Cir. 2011) (willful intent shown by debtor's discretionary spending, including purchasing vacation timeshares, purchasing stock, repaying a $30,000 personal loan, and donating approximately $81,000 to church); Volpe v. IRS (In re Volpe), 377 B.R. 579, 589 (Bankr. N.D. Ohio 2007) (citing In re Gardner, 360 F.3d 551, 560-61 (6th Cir. 2004) (debtor who used disposable income for leisure activities and private school tuition, knowing he had a significant tax liability, made voluntary decision to spend the money on himself rather than to pay his taxes, which weighed in favor of finding he willfully evaded his tax liability); United States v. Angel (In re Angel), 1994 WL 69516, at *4  (tax liabilities are nondischargeable when the debtor had "present ability to pay his taxes with cash in hand and instead bought these items for his own enjoyment").

In fact, viewing Terrell's history as a whole, the only logical inference is that Terrell *never* intended to pay his taxes but instead submitted insincere OICs and filed bankruptcy to keep IRS collection efforts at bay for as long as possible.  These actions have allowed Terrell to continue his comfortable lifestyle that includes golf club memberships and traveling for almost twenty years now, a lifestyle, the Court notes, many more taxpayers might also be able to afford if they did not bother paying their taxes.

### 4.    Terrell's Nonperformance of His 1997 Plea Agreement Supports Nondischargeability of His 1998 and 1999 Taxes.

The Court concludes it is also appropriate to take into consideration Terrell's previous guilty plea and sentencing with respect to filing a fraudulent tax return for 1997.  In the Plea Agreement, Terrell acknowledged tax losses for 1998 and 1999 and promised to pay those taxes.

57

In return for his promise, the District Court was quite lenient in sentencing Terrell, relative to the maximum penalties that could have been imposed. See ¶¶ 56, 59, 60 above. To allow Terrell to now avoid paying the 1998 and 1999 taxes he promised to pay would undercut enforcement of criminal plea arrangements.

In a similar Texas nondischargeability adversary, the debtor under IRS investigation for multiple tax periods had plead guilty to filing a fraudulent return for one taxable period and, in her plea agreement, stipulated to tax losses for other tax periods and promised to pay those taxes. When the debtor subsequently filed bankruptcy and attempted to discharge the taxes for those other periods, the Fifth Circuit Court of Appeals stated that debtor's promise to pay those taxes was an integral condition of her sentence. The Fifth Circuit concluded that

> In the light of these unique circumstances, we hold . . . these other taxes are also non-dischargeable. As a general matter, holding otherwise might – indeed, probably would – encourage unscrupulous debtors to use bankruptcy law as a shield against enforcement of criminal proceedings promises they had no intention of keeping, but nevertheless made, in order to gain a more favorable plea agreement/sentence.

Grothues v. IRS (In re Grothues), 226 F.3d 334, 339 (5th Cir. 2000).

Here, Terrell's Plea Agreement with respect to his fraudulent 1997 return also stipulates to tax losses for years 1998 and 1999 and further provides that, "[i]f defendant enters a plea of guilty as described above and fully meets all obligations under this agreement, he will not be further prosecuted by the United States for any crimes related to his participation in making and subscribing false tax returns during the period from 1998 through 2000." The IRS has not prosecuted Terrell for filing fraudulent returns in 1998 and 1999, and Terrell received a light sentence for his fraudulent 1997 return, but Terrell has yet to make good on his promise to pay

his 1998 and 1999 taxes.  A determination that those taxes are dischargeable would render the

Plea Agreement ineffective and give Terrell significantly more than the benefit of the bargain.

Based on the above discussion, the Court concludes that Terrell willfully evaded and

defeated payment of his 1998 and 1999 taxes.  Therefore, they are not dischargeable.

### III.    ANY TAX PENALTIES IMPOSED ON TERRELL ARE DISCHARGEABLE BUT INTEREST IMPOSED ON UNPAID, NONDISCHARGEABLE TAXES IS ALSO NONDISCHARGEABLE.

The Court has determined that, pursuant to Section 523(a)(1)(C), Terrell's 1998 and 1999

income taxes are not dischargeable because he filed fraudulent returns *and* willfully evaded

payment of those taxes.  The amount of the 1998 and 1999 taxes Terrell owes will be determined

by the District Court.  However, by signing a Form 4549, Terrell previously consented to

assessment of interest and civil fraud penalties on the nondischargeable taxes owed by Terrell.

As a result, the Court finds it appropriate to address the dischargeability of interest and penalties

with respect to those taxes.[23]

Section 523(a)(7) concerns dischargeability of debts for certain fines, penalties, and

forfeitures.  It provides that the discharge does not apply to any debt—

> to the extent such debt is for a fine, penalty, or forfeiture payable to
> and for the benefit of a governmental unit, and is not compensation
> for actual pecuniary loss, other than a tax penalty—
>
> > (A) relating to a tax of a kind not specified in
> > paragraph (1) of this subsection; or

---

[23]The Court notes that Exhibits 4 & 5, the IRS Certificates of Assessments, Payments, and Other Specified Matters for tax years 1998 and 1999, contain entries indicating the fraud penalties were abated, but nevertheless lays out the pertinent law regarding penalties should any penalties be applicable.

> (B) imposed with respect to a transaction or event
> that occurred before three years before the date of
> the filing of the petition[.]

11 U.S.C. § 523(a)(7).  As recently explained by another Oklahoma bankruptcy court:

> Under this section, the general rule is:  If a debt (1) is a penalty, (2)
> is payable to a governmental unit, and (3) does not compensate for
> actual pecuniary loss (i.e., is punitive rather than compensatory),
> the debt is not discharged.  But even if a debt meets these three
> criteria, if the debt is a tax penalty–as opposed to some other kind
> of fine, penalty or forfeiture–the penalty will be discharged if it
> falls within the terms of subsections (A) or (B).  Subsection (A)
> refers to Section 523(a)(1), the category of nondischargeable taxes.
> If the penalty relates to some type of tax that is not excepted from
> discharge by Section 523(a)(1), then the penalty, along with the
> related tax, is discharged.  Subsection (B) is a sort of statute of
> limitations that discharges tax penalties "imposed with respect to a
> transaction or event that occurred" more than three years prior to
> the petition date.

Moore v. Oklahoma Tax Comm'n (In re Moore), 2017 WL 934641 (Bankr. N.D. Okla. 2017).  In

this case, the fraud penalties were assessed in 2006 and relate to Terrell's 1998 and 1999 income

tax returns that were filed in 1999 and 2000.  Thus, any applicable penalties likely fall into the

Section 523(a)(7)(B) category and are dischargeable to the extent they relate to transactions or

events occurring more than three years prior to the 2010 petition date.  Roberts v. United States

(In re Roberts), 906 F.2d 1440 (10th Cir. 1990).  See also Burns v. United States (In re Burns),

887 F.2d 1541 (11th Cir. 1989).

On the other hand, any interest imposed and accrued on Terrell's unpaid

nondischargeable taxes is also nondischargeable.  Unlike tax penalties, no specific section of the

Bankruptcy Code supplies the rule for dischargeability of interest on nondischargeable taxes.

However, the United States Supreme Court provided an early pre-Bankruptcy Code answer to the

question in Bruning v. United States, 376 U.S. 358 (1964).  In Bruning, the Supreme Court held

that post-bankruptcy-petition interest on an unpaid tax debt, which was not discharged in a

taxpayer's bankruptcy proceeding, remains, after bankruptcy, a personal liability of the taxpayer.

Numerous circuit courts of appeal, including the Tenth Circuit, have determined that Bruning

continues to apply under the 1978 Bankruptcy Code.  Tuttle v. United States (In re Tuttle),

291 F.3d 1238, 1244 (10th Cir. 2002); Fulmer v. United States (In re Fullmer), 962 F.2d 1463,

1468 (10th Cir. 1992), abrogated on other grounds by Raleigh v. Illinois Dep't of Revenue,

530 U.S. 15 (2000); Burns v. United States (In re Burns), 887 F.2d 1541, 1543 (11th Cir. 1989).

According to the Eighth Circuit,

> Under both the Act and the Code, Congress attempted to balance
> the interests of the debtor, creditors and the government, and in the
> instance of taxes and interest on such, Congress has determined
> that the problems of financing the government override granting
> debtors a wholly fresh start.  H.R. Rep. No. 595, 95th Cong., 2d
> Sess. at 274 (1978), reprinted in 1978 U.S. Code Cong. and
> Admin. News 5963, 6231.  Thus, post-petition interest is
> nondischargeable, and [the debtors] remain personally liable for
> that interest subsequent to bankruptcy proceedings.

Hanna v. United States (In re Hanna), 872 F.2d 829, 831 (8th Cir. 1989).

## CONCLUSION

Terrell filed fraudulent income tax returns for tax years 1998 and 1999.  Additionally,

Terrell willfully attempted to evade or defeat those taxes.  Therefore, Terrell's 1998 and 1999

income taxes, the amount of which are to be determined by the District Court, together with any

interest imposed and accrued on Terrell's unpaid non-dischargeable taxes, are nondischargeable.

Any penalties imposed in connection with the 1998 and 1999 taxes are dischargeable to the

extent they relate to transactions or events occurring more than three years prior to the 2010

bankruptcy petition date.  However, interest on the nondischargeable taxes is also

nondischargeable.

       IT IS SO ORDERED.

# # #